UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| NOBLE ROMAN'S, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:14-cv-01734-WTL-DML |
| vs. | ) | |
| | ) | |
| HATTENHAUER DISTRIBUTING | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Plaintiff's Motion for Protective Order

Defendant Hattenhauer Distributing Company has served documents and deposition subpoenas on Privet Fund Management, LLC ("Privet Fund"), a major shareholder of plaintiff Noble Roman's, Inc.  (*See* Dkt. 130-3).  Noble Roman's filed a motion to quash the subpoenas which the court denied without prejudice.  For the reasons given in its February 25, 2016 order (Dkt. 129), the court allowed Noble Roman's to seek relief through a motion for protective order.  Noble Roman's filed such a motion.  For the reasons described in this order, the court GRANTS Noble Roman's motion for protective order (Dkt. 130) and ORDERS that Hattenhauer is prohibited from obtaining the discovery from Privet Fund sought by the subpoenas.

The court's February 25, 2016 order stated that although the court allowed Noble Roman's to seek relief through a motion for protective order, that procedure would not preclude the "standing" arguments advanced by Hattenhauer in response to Noble Roman's motion to quash the Privet Fund subpoenas.  Hattenhauer has

renewed its argument that Noble Roman's lacks standing to advance any objections to the subpoenas and to seek relief prohibiting or limiting the discovery they seek. The court will address the standing argument first. It will then address the parties' arguments regarding the merits of allowing the discovery sought by the Privet Fund subpoenas.

<u>Analysis</u>

## I.   Noble Roman's has standing to challenge the subpoenas.

Relying on district court decisions, Hattenhauer contends that Noble Roman's, as a party, "lacks standing to object to a subpoena issued on a non-party." (Hattenhauer opposition, Dkt. 131, at p. 8).  The court rejects Hattenhauer's standing argument.

Standing is a doctrine of subject matter jurisdiction, and flows from the Constitution's limit of judicial power to adjudicate "Cases" and "Controversies." *Lexmark Internat'l, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1386 (2014).  As explained by the Supreme Court, there is an "irreducible constitutional minimum of standing."  *Id.*  A court has subject matter jurisdiction to adjudicate a plaintiff's claims only if the plaintiff has "suffered or [is] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  *Id.*  The question of standing is different from an issue whether a statute—or, in this court's view, a Federal Rule of Civil Procedure—may otherwise deny a person relief for the injury he asserts is threatened by another's conduct.

*See id.* at 1387-88.  In other words, a person may have standing—and the court has subject matter jurisdiction to decide his claim—but by statute Congress may have circumscribed the type of plaintiff or type of interests for which a statutory requirement or prohibition allows the court to provide redress.  *Id.*  In that situation, the court can adjudicate the plaintiff's claim but may determine *on the merits* that the plaintiff has no cause of action.  *Id.*  In the latter vein, the court notes that Hattenhauer has made no suggestion that a statute or rule of civil procedure prohibits a court from hearing a party's objections to a subpoena directed to a non-party, or that a statute or rule of civil procedure circumscribes the types of objections a court may consider from a party that objects to a non-party subpoena.

This court acknowledges that many district court cases have invoked "standing" in ruling that a party is "generally" or "ordinarily" prohibited from objecting to a non-party subpoena, including the principal case Hattenhauer relies on, *Parker v. Four Seasons Hotels, Ltd.,* 291 F.R.D. 181, 186 (N.D. Ill. 2013).  But "standing" does not supply a proper doctrinal foundation for such a rule, at least not without an examination of the particular circumstances of a party's challenge to a non-party subpoena and evaluation of whether the party will suffer a concrete injury in fact that can be redressed by a favorable decision forbidding or limiting the discovery sought by the subpoena.  The only Seventh Circuit case to discuss a party's "standing" to challenge a non-party subpoena addressed the issue in those terms—the nature of the interest of the party that could be redressed through quashing a subpoena to a non-party.  The court stated:  "A party has standing to

move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri,* 670 F.2d 702, 712 (7th Cir. 1982) (citing *In re Grand Jury,* 619 F.2d 1022, 1027 (3rd Cir. 1980)).

*Raineri* was a criminal case.  A witness had testified during the government's presentation of its case in chief and been cross-examined by the defense.  About a week later in the trial, the defense issued a subpoena to the witness to testify again—this time during the defense's presentation of its case in chief.  The prosecutor objected and moved to quash the subpoena, and the trial court did so. On appeal, the defendant complained that the government "had no standing or authority to move to quash the subpoena" because it was addressed to a third party. The court disagreed and found that the government's "legitimate interest" in seeking redress from enforcement of the subpoena "rested upon its interest in preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [the witness's] credibility."  670 F.2d at 712.[1]

The court finds that Noble Roman's has sufficient legitimate interests of its own with respect to the Privet Fund subpoenas to be heard on whether the subpoenas should be quashed or a protective order issued prohibiting that discovery by Hattenhauer.  For one thing, if these subpoenas were enforced, Noble Roman's

---

[1]    The case cited by *Raineri* as requiring a movant to have its own "legitimate interest" in seeking to quash a third-party subpoena similarly noted the breadth of "legitimate" interest. An interest can be considered "legitimate" when the balancing of all asserted interests with respect to a particular non-party subpoena supports or requires "that the courthouse door must be open" to afford appropriate relief under the circumstances.  *See In re Grand Jury,* 619 F.2d 1022, 1026-07 (3rd Cir. 1980).

would be required to devote employee time and effort, as well as attorney time,

effort, and expense, to review the documents requested by Hattenhauer from Privet

Fund, and to devote substantial attorney time and expense for traveling to,

preparing for, and cross-examining Privet Fund Rule 30(b)(6) deponent witness(es)

in Atlanta, Georgia.  These aren't trivial issues or interests.  Indeed, it is the

strength of litigants' legitimate interests in the control of expansive discovery and

corralling the spiraling costs of litigation that led to a series of changes to the

federal discovery rules over the last thirty plus years that emphasize the power—

and *duty*—of the district courts actively to manage discovery and to limit discovery

that exceeds its proportional and proper bounds.[2]  The court will trace this evolution

in section II below, in connection with the merits of the Privet Fund subpoenas.

Of course, a party's objections may have far less force or persuasive value

(and may sometimes have no persuasive value) when discovery is directed to a non-

party and not to the party itself.  For example, a party's objection based on the time

and effort required of the non-party to comply with a subpoena might, in the usual

---

[2]      The court is also satisfied that Noble Roman's has a legitimate interest in
protecting its public shareholders from massive discovery into their analyses and
evaluations of the investments they make.  If a public (or private) shareholder were
required to provide detailed analyses of its investment decisions in every case in
which the company in which it holds stock were accused of taking action to prop up
its stock price or balance sheet (legitimately or illegitimately), some investment
might be deterred.  Courts have also allowed a party to object to non-party
subpoenas to its customers or clients based on the party's legitimate interest in
protecting that relationship from undue interference stemming from a litigant's
intrusive discovery requests.  *See Farmer v. Senior Home Companions of Indiana,
Inc.,* 2009 WL 564193 at *1 n.1 (S.D. Ind. March 5, 2009).  Noble Roman's interest
in protecting its relationships with shareholders is similar.

case, have no weight at all.  But, for example, a party's objection that the time required of the non-party to comply with the subpoena would extend the period of production of documents or the completion of depositions beyond the court's discovery deadline might be accorded substantial weight in a particular case.  Or a party's objection that the non-party discovery exceeds the proper bounds under Rule 26(b)(1) and thus unfairly burdens the party (by requiring it to devote substantial resources to reviewing the discovery, participating in depositions, or filing motions in limine) also may have substantial weight in a particular case.

Suffice it to say, this court has no doubt it has the constitutional power to adjudicate Noble Roman's objections to the subpoenas issued to non-party Privet Fund in this litigation.  Moreover, as addressed below, the discovery rules expressly empower—and direct the court—to manage discovery and to act *sua sponte* if necessary to ensure discovery is proportional to the needs of the case.

The court will now address the Privet Fund subpoenas on their merits.

## II.    The limits and breadth of discovery under Rule 26 apply to Rule 45 subpoenas to non-parties.

Rule 26 of the Federal Rules of Civil Procedure permits the discovery of nonprivileged matter "that is relevant" to a party's claim or defense and "proportional" to the needs of a case, considering the importance of the issues at stake, the importance of the discovery in resolving those issues, the amount in controversy, and the weighing of burdens and benefits.  *See* Rule 26(b)(1).  The limits and breadth of discovery expressed in Rule 26 are applicable to non-party discovery under Rule 45.  *E.g.,* Advisory Committee Note regarding 1991

6

amendments to Rule 45 ("non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34"). *Jackson v. Brinker,* 147 F.R.D. 189, 193-94 (S.D. Ind. 1993) (internal citations omitted) ("The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules.")

Rule 26's expression of the scope and limits of discovery has evolved over the last thirty years or so.  Each time the language and/or structure of the "Discovery Scope and Limits" section of the rule was changed, it was to rein in popular notions that anything relevant should be produced and to emphasize the judge's role in controlling discovery.

In 1983, Rule 26 "was amended to add a sentence to deal with the problem of over-discovery."  Advisory Committee Notes to revisions to Rule 26, reprinted in Thomson Reuters, "Federal Civil Judicial Procedure and Rules" (2015 Revised Edition) (hereafter "Committee Notes").  The new sentence—added at the beginning of Rule 26(b)(1) (the 1st paragraph of the subsection titled "Discovery Scope and Limits)—stated:

> The frequency or extent of use of the discovery methods [otherwise permitted under these rules] shall be limited by the court if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

The Committee Notes explain that these factors were designed to help combat the use of discovery disproportionate to the litigation interests at stake and to permit the court to act on motion or its own initiative to restrict discovery while also being careful not to deprive a litigant of discovery it reasonably needs in developing its case. *Id.* Ten years later in 1993, Rule 26(b) was revised again, and again its purpose was "to enable the court to keep tighter rein on the extent of discovery," especially in light of the "information explosion of recent decades" and increased costs of "wide-ranging discovery" and the greater potential for discovery to be used as an instrument to delay or to oppress.[3]   *Id.*   The court's authority to control discovery was also expressed through a revision to Fed. R. Civ. P. 1, to provide that the rules are to be "construed *and administered* to secure the just, speedy, and inexpensive determination of every action." (emphasis on the added language).[4]

In 2000, Rule 26(b) was revised to create two categories of potentially discoverable information: that which is relevant to a claim or defense and that which is merely relevant to the "subject matter" of the case.  The latter required a showing of good cause before discovery was permitted.  (*See* Committee Notes).  The Advisory Committee commented that there may be difficulties in distinguishing

---

[3]     The 1993 amendments also introduced the automatic initial disclosures rules, created new presumptive limits for interrogatories and depositions, and required the parties to develop a discovery plan early in the case.

[4]     As part of the 2015 revisions, Rule 1 was amended and now reads that the rules are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  This change was to emphasize the parties' role in using the rules appropriately.  *See* Committee Notes to 2015 amendment to Rule 1.

these types of information in a particular case, but intended to express the need for parties to focus "on the actual claims and defenses" and for the court to exercise its power to determine the scope of discovery in a case based on that case's particular needs.  (*Id.*)

Fifteen years later, effective December 1, 2015, Rule 26(b) underwent its most recent structural and linguistic alteration.  And, once again, the changes were designed to protect against over-discovery and to emphasize judicial management of the discovery process, especially for those cases in which the parties do not themselves effectively manage discovery.  (*See* Committee Notes).  This time, the proportionality factors the rules originally had expressed in 1983 (*e.g.,* consideration of relative burden and expense, the amount in controversy, importance of issues at stake) were added back to the very first subdivision and sentence of "(b) Discovery Scope and Limits" and the limiting phrase, "proportional to the needs of the case," was added in express and not just implicit language.  The Committee Notes emphasize that the parties and the court "have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Rule 26(b)(1) now reads:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within the scope of discovery need not be admissible in evidence to be discoverable.

And even if discovery requests fall within the above scope of discovery, the court still may impose other limits because, for example, the discovery is unreasonably cumulative, can be obtained in a more convenient way, or the discovering party has already had ample opportunity to obtain what it is seeking.  *See* Rule 26(b)(2)(C).

## III.   The court can issue a Rule 26(c) protective order to enforce limits on discovery provided by Rule 26(b).

The court addresses one further issue about its ability to enforce the scope and limits of discovery expressed in Rule 26(b).  Hattenhauer asserts that the "good cause" requirement for issuing a protective order under Rule 26(c)[5] requires the movant to establish that the requested discovery "will cause a clearly defined and serious injury."  (Dkt. 131 at pp. 7-8)  It relies on a single district court decision for this "rule": *Wine & Canvas Dev. LLC v. Weisser,* 2014 WL 1379710 at *1 (S.D. Ind. Apr. 8, 2014), *reconsideration denied,* 2014 WL 1511674 (S.D. Ind. Apr. 15, 2014). In *Wine & Canvas,* the party-movants (a woman and her boyfriend) asked the court to forbid questioning in a deposition of another party (the woman's father) about the fact that the years-earlier wedding of the woman and her boyfriend was not a legal marriage because the "groom's" prior marriage had not yet been dissolved.  (The couple had not legally married in the ensuing years.)  The court denied the motion for protective order because credibility of the party-movants was a particularly important facet of the case and the movants' years-long deception of the woman's

---

[5]    Rule 26(c) states: "The court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense, including" forbidding discovery or limiting discovery to certain matters.

father may become admissible evidence affecting their credibility.  2014 WL

1379710 at *1.  In reaching its conclusion, the court stated that good cause for a

protective order "is established by showing that the disclosure will cause a clearly

defined and serious injury," citing *Felling v. Knight,* 2001 WL 1782360 (S.D. Ind.

Dec. 21, 2001).  *Felling* concerned the issuance of a protective order to prohibit the

public dissemination of transcripts and videotapes of depositions taken of public

figures about Indiana University's men's basketball program.  Relying on since-

abrogated Seventh Circuit authority, the *Felling* court reasoned that because of "a

presumption of public access to discovery materials," any restriction on the

dissemination or "sealing" of discovery from the public requires a showing that

"disclosure will cause a clearly defined and serious injury."  *Id.* at *1-2.[6]  The public

access and sealing issues addressed in *Felling,* and from which the *Wine & Canvas*

court borrowed a standard for issuing a protective order, are not germane here.  It is

also significant that *Wine & Canvas* does not hold that a showing of a "clearly

defined and serious injury" is always required for the issuance of a protective order.

While this court agrees with *Wine & Canvas* that such a showing may strongly

---

[6]      The Seventh Circuit no longer endorses a rule that discovery materials are
presumptively accessible to the public.  Presumptive public access occurs only when,
and if, the discovery materials are filed as part of the judicial proceeding and
underpin the court's decisions on substantive matters.  Before then, "[s]ecrecy is
fine at the discovery stage."  *Baxter Internat'l, Inc. v. Abbott Labs.,* 297 F.3d 544,
545 (7th Cir. 2002).  *See also City of Greenville v. Syngenta Crop Protection, LLC,*
764 F.3d 695, 697 (7th Cir. 2014) (internal citations and quotations omitted)
("Discovery material can be shielded from the public eye.  Once filed with the court,
however, documents that affect the disposition of federal litigation are
presumptively open to public view unless a statute, rule, or privilege justifies
confidentiality.")

11

counsel in favor of a protective order, the court disagrees with Hattenhauer that the court's protective order power is limited to instances where that showing is made.

Even as of the 1983 amendments to Rule 26(b), the Committee Notes recognize that the limits on discovery expressed in that rule can be enforced through a motion for protective order under Rule 26(c).  (*See* Committee Notes regarding 1983 amendments to Rule 26(a) and Rule 26(b).)  That makes sense.  One ground for issuing a protective order is "undue burden"; one reason a party may be deemed unduly burdened by discovery is that the discovery falls outside its proper scope and limits under Rule 26(b).  Simply put, this court does not doubt it can issue a protective order as a means of enforcing the scope of discovery and its limits expressed in Rule 26(b).

## IV.   Hattenhauer's subpoenas to Privet Fund are not proportional to the needs of this case.

Hattenhauer is a Noble Roman's franchisee.  It owns and operates gas stations with associated convenience stores in Washington and in Oregon.  The parties' relationship is governed, in part, by written franchise agreements— originally entered in 2005 and 2006—that allow Hattenhauer to purchase ingredients to make and sell Noble Roman's pizza products at the convenience stores.  Hattenhauer owes Noble Roman's royalty fees based on weekly "gross sales" (a term defined in the agreement) and Noble Roman's has the right to audit Hattenhauer's "books and records" to confirm the payment of proper royalties.  In about April 2014, Noble Roman's told Hattenhauer it had audited Hattenhauer's Oregon and Washington stores and determined that additional royalties were owed

12

because of underreported sales.  At least once, Noble Roman's made an electronic withdrawal (less than $500) from a Hattenhauer bank account to recover the alleged additional royalties.  After Hattenhauer objected to Noble Roman's conduct and challenged the audits, Noble Roman's conducted additional audits in May or June 2014—this time calculating alleged unpaid royalties dating to the inception of Hattenhauer's franchises—and demanded payment for the unpaid royalties.

Noble Roman's brought this suit to recover the alleged unpaid royalties plus interest and attorneys' fees for cost of collection.  The alleged unpaid royalties total about $64,000.  Its suit also seeks relief under the Lanham Act based on an allegation that Hattenhauer used non-conforming menu ingredients (a type of cheese) in making the Noble Roman's food products.  Hattenhauer has filed a counterclaim.  With respect to underpaid royalties, Hattenhauer contends the franchise agreements do not permit the type of audits conducted by Noble Roman's. It asserts the audits were based on flawed—and knowingly flawed—methodology and are invalid.  Hattenhauer contends the impetus for the 2014 audits and their alleged flawed methodology was Noble Roman's poor financial condition; it charges Noble Roman's with using knowingly flawed audits as part of an illegitimate means for propping up Noble Roman's balance sheet and for doing so quickly by either (a) withdrawing the alleged unpaid royalties from its franchisees' bank accounts or (b) obtaining payment through a threat of franchise termination or litigation. Hattenhauer's legal claims include breach of contract, breach of an implied covenant of good faith, and breach of state franchise protection acts.  It has also

13

sought leave to amend its counterclaim to add theories of relief under the Indiana Offenses Against Property Act based on deception, trespass, and conversion.

The subpoenas to Privet Fund seek information bearing an attenuated and indirect relationship to Hattenhauer's theories. Noble Roman's is a public company, and Privet Fund is a major shareholder. As of June 23, 2014, Privet Fund beneficially owned 1,428,999 shares, or 7.2%, of Noble Roman's common stock. Its beneficial ownership group acquired the bulk of those shares (1,242,355) between April 25, 2014, and June 20, 2014.[7] In November 2015, Privet Fund delivered a letter to Noble Roman's board of directors expressing its concerns about Noble Roman's operations, management, and leadership, and its belief that management's and the board's failures have depressed the true value of the company. ("We [Privet Fund] believe the value of the Company's assets to be significantly higher than the current market value, a divergence we believe to be directly correlated to the

---

[7]     This information is derived from Privet Fund's Schedule 13D, filed with the SEC on June 23, 2014. Schedule 13D is a report that must be filed by a shareholder within 10 days of its acquiring beneficial ownership of more than 5% of a voting class of a public company's registered equity securities. (*See* Dkt. 131-3). Privet Fund reported that it (actually, its beneficial ownership group) owned a total of 1,429,999 shares and had acquired 7.2% of Noble Roman's common stock as of June 20. As required by Schedule 13D, the group listed the dates, amounts, and prices of its share purchases within the preceding 60 days; those total 1,242,355 shares. The beneficial ownership group (persons who directly or indirectly share voting power or the power to sell the securities) consists of Privet Fund LP, Privet Fund Management LLC (the general partner and investment manager of the limited partnership), and Ryan Levenson, the sole managing member of the LLC. *See* Schedule 13D, at Dkt. 130-4. According to a November 2015 letter from Privet Fund to Noble Roman's board of directors, Privet Fund beneficially owns (as of that time) more than 14% of Noble Roman's common stock. *See* Dkt. 130-2 at p. 37.

14

aforementioned operational and governance shortcomings.")  In December 2015, Privet Fund delivered a second letter to the board, in which it addressed the resignation of a board member (Jeffrey Gaither, a partner with the law firm that represents Noble Roman's) and its concerns regarding the independence of the board and the company's underperforming share price and operations.  (*See* Dkt. 130-1 at p. 35.)

Hattenhauer's subpoenas seek from Privet Fund production of 23 categories of documents (Dkt. 130-3 at pp. 7-10) and Rule 30(b)(6) testimony from Privet Fund witnesses about the same subject matter of the document requests plus four other topics (*see* topics 14, 19, 28, and 29; Dkt. 130-3 at pp. 34-37).  The categories of information are wide-ranging and include essentially all documents and information relating to Privet Fund's November and December 2015 letters to Noble Roman's board of directors, to Privet Fund's investigation and analysis of Noble Roman's operations, management, finances, and business plans, and to Privet Fund's acquisition of Noble Roman's stock.  The subpoenas also seek any documents and information about Noble Roman's audits of its franchisees.

Noble Roman's asserts that the subpoenas are an improper fishing expedition and seek information outside the proper bounds of discovery.  Noble Roman's contends that Privet Fund's Schedule 13D shows Privet Fund did not begin to amass large amounts of Noble Roman's shares until April 2014, and thus *after* Noble Roman's made the business decision in early 2014 to conduct audits of its

non-traditional franchisees like Hattenhauer.[8]  Noble Roman's also asserts that

neither Privet Fund nor anyone associated with it is a director, officer, or member of

Noble Roman's management, and thus Privet Fund could not shed light on the

contested issues between the parties about (a) the reasons Noble Roman's chose to

conduct audits of its franchisees in 2014 (including the audits in April, June, and

September), (b) Noble Roman's choice of methodology for conducting the audits and

use of electronic withdrawals from franchisee bank accounts, or (c) whether Noble

Roman's methodology or conduct of the audits is consistent or inconsistent with the

franchise agreements. Noble Roman's also notes it has produced to Hattenhauer (i)

Noble Roman's correspondence with Privet Fund, (ii) Noble Roman's financial

information, and (iii) myriad documents relating to the audits themselves.  Noble

Roman's has (or will) produce Rule 30(b)(6) witnesses to answer Hattenhauer's

questions about the implementation and conduct of the 2014 audits.  In addition,

this court has ordered Noble Roman's to produce a sizable sampling of audit

documents, including back-up materials.  *See* Order on Motion to Compel, Dkt. 128.

---

[8]      The parties debate when Privet Fund first bought Noble Roman's shares.
Although the court agrees with Hattenhauer that the evidence indicates Privet
Fund first bought some shares at some time before April 25, 2014, and it appears
Privet Fund continued to buy shares in 2014 and 2015 (having increased its
holdings to 14% by November 2015), that timing does not make discovery from
Privet Fund appropriate.  Noble Roman's first communication with Privet Fund was
in mid-April 2014 (*see* Dkt. 130-1 at p. 1), after Noble Roman's formulated its non-
traditional franchisee audit program and methodology. Moreover, as the court's
discussion in Section IV of this order demonstrates, the timing of Privet Fund's
share ownership is essentially immaterial to the court's determination of the
proportionality of the discovery sought from Privet Fund.

In sum, Noble Roman's argues that (a) Hattenhauer has been permitted to pursue, and is pursuing, a broad range of discovery from Noble Roman's itself to explore Hattenhauer's defense and counterclaim theories focused on the illegitimacy of the methodology of the audits and that "Wall Street" pressure guided Noble Roman's choice of methodology and decisions to conduct audits in the first place and (b) the information sought from Privet Fund does not materially advance those theories but are a fishing expedition that should not be permitted.

In response, Hattenhauer beats the drum of "relevancy."  It asserts that all of its deposition topics and document requests are "relevant."  That's not good enough. Hattenhauer never attempts to demonstrate that the discovery is in any way proportional to the needs of this case, considering such things as the amount in controversy, the importance of the information in resolving contested issues, whether the burden of the discovery outweighs its likely benefits, whether the information can be obtained from other and more convenient sources, or whether the information is cumulative to other discovery Hattenhauer has obtained.  *See* Rule 26(b).  Two examples help illustrate the abject disproportionality of the discovery Hattenhauer wants from Privet Fund.

First, Hattenhauer emphasizes that Noble Roman's financial condition is "relevant" to its theory Noble Roman's instituted the audits and devised the alleged flawed audit methodology because its financial condition and prospects were bleak. But Hattenhauer does not explain why obtaining a shareholder's analysis of Noble Roman's management practices and financial prospects is reasonably necessary.

Privet Fund cannot answer about Noble Roman's evaluation of its financial condition and the extent to which any such evaluation affected Noble Roman's implementation of audits or choice of audit methodology.[9]  Second, Hattenhauer wants Privet Fund to produce any documents it may have and to answer questions about the resignation of Jeffrey Gaither from Noble Roman's board of directors.  Yet Hattenhauer has deposed Mr. Gaither himself, and undoubtedly inquired about the reasons for his resignation (and his knowledge as a board member about the audits and their methodology).  Hattenhauer's statement that its taking of Mr. Gaither's deposition "is irrelevant to whether this Court should prohibit the subpoenas to the Privet Fund" (Dkt. 131 at p. 18) reveals its serious misunderstanding of Rule 26(b).

The court finds that Hattenhauer's documents and deposition subpoenas to Privet Fund constitute discovery run amok.  Asking Privet Fund to provide every document and every piece of information it has—including information it may have obtained orally from Noble Roman's personnel—about every aspect of Noble Roman's business operations, finances, marketing plans, and management

---

[9]     Hattenhauer notes that Noble Roman's CEO, Paul Mobley, reported to securities analysts in a March 12, 2015 "Fourth Quarter 2014 Financial Results Conference Call" that a "fairly significant increase" in the asset lines of the balance sheet was related to the audits it had been conducting of non-traditional franchisees and "most of that [increase] is generated from [those audits.]"  *See* Dkt. 131-1 at p. 10.  Hattenhauer will have, or already has had, the opportunity to question Mr. Mobley (and perhaps other members of Noble Roman's management or board) about the effect of the audits on Noble Roman's balance sheet and the effect that a better balance sheet had on the decisions to conduct the audits and their methodology in the first place.

structure is discovery too far afield from the contested issues in this case.[10] Hattenhauer's subpoenas to Privet Fund fail the proportionality test under Rule 26(b). Therefore, the court GRANTS Noble Roman's motion for a protective order.

**V.     The court will not award fees.**

The prevailing party on a motion for a protective order is entitled to fees unless its opponent's position was substantially justified or other circumstances make an award of fees unjust. *See* Fed. R. Civ. P. 26(c)(3) (incorporating the loser pays provision of Rule 37(a)(5) to rulings on protective orders). The court determines that an award of fees would not be just here. Although Hattenhauer did not establish, or even attempt to establish, proportionality for its desired discovery from Privet Fund, its "standing" argument was supported with some legal authority, even though the authority it relied on was not binding on the court and not persuasive to this court.

<u>Conclusion</u>

Noble Roman's motion for a protective order (Dkt. 130) is GRANTED. The court ORDERS that Hattenhauer is prohibited from obtaining by its subpoenas the discovery sought from Privet Fund. The court DENIES Noble Roman's request for fees.

So ORDERED.

Dated:  March 24, 2016

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

---

[10]     The court notes here that there is not a single reference to franchisee audits in any of Privet Fund's communications to Noble Roman's board of directors. *See* Dkt. 130-1.

Distribution:

All ECF-registered counsel of record by email through the court's ECF system