UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NOBLE ROMAN'S, INC., Plaintiff, | ) | |
| v. | ) | Case No.: 1:14-cv-01734-WTL-DML |
| HATTENHAUER DISTRIBUTING COMPANY, Defendant. | ) | |

**DEFENDANT HATTENHAUER DISTRIBUTING COMPANY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................ 6

STATEMENT OF ISSUES ........................................ 10

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................ 12

The Parties' Contracts and Relationship ........................................ 12

Noble Roman's Decision to "Audit" Its Non-Traditional Franchisees Using Sales & Purchases Comparisons ........................................ 15

Noble Roman's Withdraws Funds from Hattenhauer for the Sales & Purchases Comparisons ........................................ 15

Noble Roman's admits that the SPCs do not calculate Hattenhauer's actual gross sales ............ 19

Noble Roman's discriminates against Hattenhauer for the Sales & Purchases Comparisons ........................................ 22

Noble Roman's lacks meaningful quality control ........................................ 23

Argument and Authorities ........................................ 25

I. Hattenhauer is entitled to summary judgment on BOTH PARTIES' breach of contract claim regarding royalties ........................................ 25

A. Noble Roman's breached the Franchise Agreements by charging royalties for estimated and potential sales instead of actual gross sales ........................................ 26

B. Noble Roman's breached the Franchise Agreements by ignoring the auditing procedure that they mandate ........................................ 30

i. Noble Roman's did not audit or review Hattenhauer's books and records ........................................ 30

ii. Noble Roman's did not perform an audit at Hattenhauer's franchise locations or offices ............ 31

C. Noble Roman's breached the Franchise Agreements when it attempted to withdraw funds from Hattenhauer's franchise accounts without notice or demand for its purported "audits ............ 31

i. Noble Roman's breached the Franchise Agreements when it withdrew funds from Hattenhauer's account without making a demand ............ 32

ii. Noble Roman's breached the Franchise Agreements when it withdrew funds beyond Hattenhauer's reported gross sales ............ 32

D. Noble Roman's failed to mitigate its damages for the alleged unpaid royalties ............ 32

II. Hattenhauer is entitled to summary judgment on Noble Roman's breach of contract claim regarding the substitute cheese ............ 33

A. Hattenhauer did not breach the Franchise Agreements because it purchased the Substitute Cheese in accordance with Noble Roman's policies ............ 33

B. Noble Roman's is not entitled to damages because Hattenhauer has paid all royalties from the sales of pizzas involving the Substitute Cheese ............ 34

C. Noble Roman's failed to mitigate its supposed damages from the use of the substituted cheese ............ 34

III. Noble Roman's Lanham Act claim fails as a Matter of law ............ 35

A. Noble Roman's Lanham Act claim fails under the doctrines of laches and acquiescence because Noble Roman's was aware of the Substitute Cheese purchase for four years, and implied its consent.................................................. 35

B. Noble Roman's Lanham Act claim fails as a matter of law because its inadequate quality control caused it to abandon or forfeit its purported trademark rights, or to be estopped from complaining about Hattenhauer's putative infringement ........................................................................................ 37

C. Similarly, Noble Roman's Lanham Act claim fails as a matter of law because Noble Roman's cannot show that it had a rigorous quality control regime to which it adhered and Hattenhauer did not .......................................... 40

D. Even if it could establish liability under the Lanham Act, which it cannot, Noble Roman's is not entitled to any monetary award under the Act on the equities of this case ............................................................................................ 41

E. Even if it could establish liability under the Lanham Act, which it cannot, Noble Roman's is not entitled to recover its attorney's fees as a matter of law .................................................................................................................. 46

IV. Hattenhauer is entitled to Judgment in Its Favor Under the Indiana Crime Victim's Relief Act ..................................................................................................... 46

IV. Noble Roman's violated the Washington Consumer Protection Act as a Matter of law ....................................................................................................................... 48

A. Noble Roman's violations of the Franchise Investment Protection Act are unfair and deceptive acts or practices under the CPA ......................................... 49

i. Noble Roman's unlawfully discriminated against Hattenhauer ............... 49

ii. Noble Roman's bad faith pervaded its dealings with Hattenhauer .......... 51

B. Noble Roman's discrimination and bad faith were conducted as a part of Noble Roman's trade and practice .......... 53

C. Noble Roman's unfair and deceptive practices injure the public interest .......... 53

D. Noble Roman's unfair and deceptive practices directly injured Hattenhauer .......... 54

CERTIFICATE OF SERVICE .......... 55

# TABLE OF AUTHORITIES

## Cases

*AmCan Enter., Inc. v. Renzi*, 32 F.3d 233 (7th Cir. 1994) ........ 38

*Banjo Buddies, Inc. v. Renosky*,
399 F.3d 168 (3d Cir. 2005) ........ 45

*Barcamerica Int'l USA Trust v. Tyfield Imps.,*
*Inc.*, 289 F.3d 589 (9th Cir. 2002) ........ 38

*BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081 (7th Cir. 1994) ........ 41, 42, 43

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir.), *reh'g denied*, 807 F.3d 839 (7th Cir. 2015) ........ 25

*Boss Products, Inc. v. Port-A-Pit Bar-B-Que of Edgerton, Inc.*, No. 3:05-CV-293 RM,
2009 WL 260793 (N.D. Ind. Feb. 4, 2009) ........ 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 25

*Champion Plug Co. v. Sanders*,
331 U.S. 125 (1947) ........ 43

*Chattanoga Manufacturing, Inc. v. Nike, Inc.*,
301 F.3d 789 (7th Cir. 2002) ........ 35, 36

*Claire's Boutiques, Inc. v. Brownsburg Station Partners, LLC*,
997 N.E.2d 1093 (Ind. Ct. App. 2013) ........ 26, 27, 28, 31

*Coach, Inc. v. Treasure Box, Inc.*, 2014 U.S. Dist. LEXIS 28713 (N.D. Ind. Mar. 6, 2014) ........ 46

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 580 F. Supp. 634 (S.D.N.Y. 1984) ........ 44

*Dunkin' Donuts of America, Inv. v. Minerva, Inc.*,

956 F.2d 1566 (11th Cir. 1992), *reh'g denied*, 966 F.2d 1463 (1992) ................ 30, 31, 51

*Eva's Bridal, Ltd. v. Halanick Enters.*,

639 F.3d 788 (7th Cir. 2011) ........................................................................ 38

*Fischer v. Heymann*,

12 N.E.3d 867 (Ind. 2014), *reh'g denied* (Oct. 9, 2014) ................................................ 33

*Ford Motor Co. v. Cook*, 1992 U.S. Dist. LEXIS 13294 (N.D. Ill. Aug. 28, 1992).................... 41

*General Elec. Co. v. Speicher*,

877 F.2d 531 (7th Cir. 1989) ........................................................................ 40

*George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992).................................. 42, 43

*Haegert v. Univ. of Evansville*,

977 N.E.2d 924 (Ind. 2012) ........................................................................ 25

*Heartland Resources, Inc. v. Bedel*, 903 N.E.2d 1004 (Ind. Ct. 2009)...................................... 47

*Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*,

983 N.E.2d 574 (Ind. 2013) ........................................................................ 25

*Hot Wax, Inc. v. Turtle Wax, Inc.*,

191 F.3d 813 (7th Cir.1999) ........................................................................ 25, 36

*Hyson USA, Inc. v. Hyson 2U, Ltd.*, --- F.3d ---, No. 14-3261, 2016 WL 2849334 (7th

Cir. May 16, 2016)........................................................................ 36, 37

*Iberia Foods Corp. v. Romeo*,

150 F.3d 298 (3d Cir. 1998)........................................................................ 40

*ISP.NET.LLC v. Qwest Communs. Int'l, Inc.*, 2004 U.S. Dist. LEXIS 20237 (S.D. Ind.

Sept. 24, 2004) ........................................................................ 43

*Larson v. Karagan*, 979 N.E.2d 655 (Ind. Ct. App. 2012) .................................................. 46, 47

*Members 1st Fed. Credit Union v. Metro Bank*, 2011 U.S. Dist. LEXIS 6005 __ (M.D. Pa. Jan. 21, 2011) ......................................................................................... 45

*Midland-Guardian Company v. United Consumers Club, Inc.*, 499 N.E.2d 792 (Ind. Ct. 1986.) ......................................................................................................... 48

*Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958 (7th Cir. 2010) ......................................................................................................... 46

*Polymer Technology Corp. v. Mimran*, 37 F.3d 74 (2d Cir. 1994) ............................................ 40

*Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540 (Fed. Cir. 1984)........................................................................... 36

*Roulo v. Russ Berrie & Co.*, 886 F.2d 931 (7th Cir. 1989)......................................................... 43

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992) .................... 43, 44

*Sorrel v. Eagle Healthcare, Inc.*, 38 P.3d 1024 (Wash. Ct. App. 2002)...................................... 54

*Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509 (D.N.J. 1990) ...................................................................... 36

*TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876 (7th Cir. 1997).................................. 38

*Trujillo v. Northwest Trustee Services, Inc.*, 355 P.3d 1100 (Wash. 2015)................................. 49

*Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202 (7th Cir. 1990) ..................... 40, 42

*Wine & Canvas Dev. LLC v. Weisser*, 2015 U.S. Dist. LEXIS 57348 (S.D. Ind. May 1, 2015) ......................................................................................................... 42

*Wisconsin Cheese Grp., Inc. v. V & V Supremo Foods, Inc.*, 537 F. Supp. 2d 994 (W.D. Wis. 2008)................................................................................................ 36

**Other Authorities**

J.T. McCarthy, Trademarks and Unfair Competition (2d ed. 1984) ("*McCarthy*"), at

§ 18:42 .................................................................................................. 38, 43, 44

Rest. (3d) of Unfair Competition, § 36, Comments g, j, § 37 ..................................................... 43

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................................... 25

**8**

15 U.S.C. § 1117(a) ............................................................................................... 41, 46

15 U.S.C. § 1125(a) ..................................................................................................... 40

15 U.S.C. § 1127 .......................................................................................................... 37

Ind. Code § 34-24-3-1 ........................................................................................... 46, 47

Ind. Code § 35-41-2-1 .................................................................................................. 47

Ind. Code § 35-43 ........................................................................................................ 47

Ind. Code § 35-43-2-2(b)(4) ........................................................................................ 47

Ind. Code § 35-43-4-3 .................................................................................................. 47

Ind. Code § 35-43-5-3(a)(2) .......................................................................................... 47

Wash. Rev. Code Ann. § 19.100.180 .............................................................................. 49

Wash. Rev. Code Ann. § 19.100.180 (1) ......................................................................... 51

Wash. Rev. Code Ann. § 19.100.180 (b)(2) ..................................................................... 49

Wash. Rev. Code Ann. § 19.100.190(1) .......................................................................... 49

Wash. Rev. Code Ann. § 19.86.093 ................................................................................ 53

## STATEMENT OF ISSUES

1. Whether Hattenhauer is entitled to summary judgment on both parties' breach of contract claims, when Noble Roman's seeks royalties on inaccurate potential sales, instead of gross sales, and disregards the audit procedure in the Franchise Agreements.

2. Whether Hattenhauer is entitled to summary judgment on Noble Roman's breach of contract claim when the purchase of substitute cheese did not violate the Franchise Agreements, and Hattenhauer paid royalties on all pizza with substitute cheese.

3. Whether Noble Roman's failed to mitigate its damages.

4. Whether Hattenhauer is entitled to summary judgment on the Lanham Act claim when Noble Roman's knew of each substitute cheese purchase and implied its consent for its use, engaged in inadequate quality control and failed to have a rigorous quality control regime.

5. Whether Hattenhauer is entitled to summary judgment on the Indiana Crime Victims Relief Act claim when Noble Roman's committed the crimes of deception, criminal trespass, and criminal conversion.

6. Whether Hattenhauer is entitled to summary judgment on the Washington Consumer Protection Act claim when Noble Roman's discriminated against Hattenhauer and acted in bad faith.

## OVERVIEW

Plaintiff Noble Roman's, Inc. is a struggling franchisor with less than $8 million in revenue, despite its status as a publicly traded corporation. Noble Roman's stock price currently trades around $0.50 a share, down from $1.87 in December 2013. Noble Roman's franchise system is marred by an inadequately controlled distribution system, poor quality control, and a general failure to communicate with its franchisees.

Hattenhauer has been a Noble Roman's franchisee since 2005. Noble Roman's always informed Hattenhauer after site inspections that Hattenhauer properly reported its sales and paid its royalties. In 2010, Noble Roman's distributor substituted pizza cheese for one of Hattenhauer's locations after Noble Roman's approved product substitutions for years, informing Noble Roman's of these substitutions each month. Noble Roman's failed to mention the purchases, even when it visited Hattenhauer's locations in 2012. Instead, Noble Roman's silently collected Hattenhauer's weekly royalty payments without doing or saying much else, largely ignoring Hattenhauer's requests for updated manuals and training.

Then, in the first quarter of 2014, faced with increasing financial pressures and a need to prop up its flagging revenue, Noble Roman's Chairman of the Board and Chief Financial Officer, Paul Mobley, concocted a scheme to quickly fill up the coffers – at the expense of its franchisees. Noble Roman's had never engaged in a mass "audit" of franchisees, but in 2014 Noble Roman's "audited" over 300 franchisees during which it attempted to collect at least $1.3 million from franchisees. Mr. Mobley urgently directed an employee to work overtime to perform these so-called audits.

Instead of following the auditing procedure in the franchise agreements, Noble Roman's created a spreadsheet that calculated "potential" sales it believed a franchisee should have had in a perfect world. Indeed, Noble Roman's admits that the Comparisons do not calculate actual gross sales. Noble Roman's calculated an amount of alleged underreporting of royalties it claimed was owed for potential sales and initiated electronic transfers from its franchisee's bank accounts for the "underreported sales." In Hattenhauer's case, and in many others, this was done without prior notice of either the "audit" or the withdrawal. Noble Roman's took the money and ran, much like a bank robber.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### The Parties' Contracts and Relationship

1. Hattenhauer Distributing Company ("Hattenhauer") is an Oregon corporation that owns and operates 21 gas stations and associated convenience stores, including one in Goldendale, Washington ("Washington location") and one in Biggs Junction, Oregon ("Oregon location") (collectively "Hattenhauer's franchise locations"). (Noble Roman's Answer to Am. Countercl., Doc. 147 at 1-2, ¶ 1, 4; Declaration of John Doug Hattenhauer, ¶ 4, Exh. 1) ("D. Hattenhauer Decl.").

2. On April 28, 2005, Hattenhauer signed a five-year Noble Roman's Pizza agreement for the Oregon Location. (Doc. 147 at 2-3, ¶ 5; Doc. 1-3). On August 10, 2006, Hattenhauer signed a 10-year Noble Roman's Pizza agreement for the Washington Location. (Doc. 147 at 2-3, ¶ 5; Doc. 1-1). On August 11, 2006, Hattenhauer signed a 10-year franchise agreement for the Washington Location for another Noble Roman's franchise concept, Tuscano's Italian Style Subs. (Doc. 147 at 2-3, ¶ 5; Doc. 1-2).

3. In 2009, Noble Roman's conducted a "Sales & Purchases Comparison" of Hattenhauer's Locations ("SPCs"). Noble Roman's determined that Hattenhauer had underreported its sales by 32.9% at the Oregon Location and by 34.7% at the Washington location. (SPCs for August 2008 to July 2009, Exh. 2).

4. Noble Roman's did not tell Hattenhauer that it had conducted SPCs for its locations in 2009. (Exh. 1, D. Hattenhauer Decl., ¶ 5). The first time Hattenhauer learned about the 2009 SPCs was during discovery in this lawsuit. (*Id.*).

5. At various times from 2006 to 2010, Noble Roman's visited Hattenhauer's Locations and completed checklists titled "Unit Evaluations" or "Opportunities Assessments"

("inspection reports") to monitor Hattenhauer's compliance with the Franchise Agreements. (30(b)(6) Dep. of Noble Roman's, Vol. II, dated April 20, 2016, 46:24-50:16; 68:24-70:19, Exh. 3) ("Noble Roman's dep. II").

6. Noble Roman's completed the following inspection reports for Hattenhauer's locations: (1) Oregon location: September 6, 2006, Exh. 4; (2) Oregon and Washington location: July 14, 2007, Exh. 5; (3) Oregon and Washington locations: January 16, 2009, Exh. 6; (4) Oregon and Washington locations: October 8, 2009, Exh. 7; and Washington location: July 12, 2010, Exh. 8 ("completed inspection forms").

7. The completed inspection forms state that Hattenhauer reported its sales and royalties accurately. (Exhs. 4-8). Several forms noted Hattenhauer's discount pricing and value meals. (Exh. 4 at 2, Exh. 5 at 2 and 5, Exh. 2, Exh. 7 at 2). One completed inspection report stated that Hattenhauer was "[e]xperiencing serious distributor problems" and "[c]onstantly out of sauce, pizza crust and pastas." (Exh. 4 at 4).

8. In 2010, the Noble Roman's approved distributor for Hattenhauer's locations changed from Cheeseman Corporation to McDonald Wholesale Company ("McDonald"). (Exh. 1, D. Hattenhauer Decl., ¶ 6).

9. In 2010, McDonald Wholesale substituted other products for Noble Roman's products that it shipped to Noble Roman's franchisees, with Noble Roman's approval. (30(b)(6) dep. of McDonald Wholesale Company, dated April 13, 2016 26:5-27:14, Exh. 9) ("McDonald dep.").

10. McDonald Wholesale sold Hattenhauer several different pizza cheeses in August 2010 for the Oregon location, including a pizza cheese manufactured by Golden California ("Substitute Cheese"). (Distributor report from McDonald Wholesale, Exh. 10).

11. Hattenhauer did not request the Substitute Cheese. (Exh. 1, D. Hattenhauer, Decl. ¶ 8).

12. Noble Roman's did not communicate to Hattenhauer the brand or manufacturer of the Noble Roman's preferred pizza cheese. (Exh. 1, D. Hattenhauer Aff, ¶ 30).

13. The Substitute Cheese was often more expensive than Noble Roman's preferred pizza cheese. (Declaration of T. Elliot ¶ 10, Exh. 11) ("T. Elliot Decl.").

14. Noble Roman's admits that it has no evidence that the Substitute Cheese was inferior or cheaper. (Exh. 3, Noble Roman's dep. II, 132:1-20, 192:6-16).

15. On March 21, 2011, Noble Roman's renewed the Noble Roman's Pizza agreement for the Oregon Location. (Doc. 147 at 2-3, ¶ 5; Doc. 1-4) ("Franchise Agreements," collectively with Docs. 1-1, 1-2, and 1-3). Noble Roman's initiated the renewal. (Letter, Exh. 12). At that time, Noble Roman's did not inform Hattenhauer of any violations of the franchise agreements. (Exh 1, D. Hattenhauer, Decl. ¶ 9).

16. On August 23, 2012, Noble Roman's sent Greg McPeters, one of its franchise managers, to Hattenhauer's locations for training. Noble Roman's did not create an inspection report for these visits. Greg McPeters did not tell Hattenhauer to stop using the Substitute Cheese. (Blank Inspection Form, Exh. 13; Exh. 11, T. Elliot Decl., ¶ 4).

17. No Noble Roman's representative has conducted training at or inspected Hattenhauer's franchise locations since 2012. (Exh 1, D. Hattenhauer Decl. ¶ 10).

18. McDonald Wholesale sold the Substitute Cheese to Hattenhauer's Oregon location until September 2014, when Noble Roman's instructed McDonald Wholesale and Hattenhauer to stop the purchases. These Substitute Cheese purchases were listed in the monthly reports that McDonald sent to Noble Roman's. (Exh. 9, McDonald dep., 22:15-24:22).

**Noble Roman's Decision to "Audit" Its Non-Traditional Franchisees Using Sales & Purchases Comparisons**

19. In 2014, Noble Roman's decided to conduct mass "audits" of all of its non-traditional franchisees, which are franchises located within an existing business such as a convenience store. Noble Roman's considers Hattenhauer a non-traditional franchisee. (30(b)(6) dep. of Noble Roman's, dated April 19, 2015, 17:20-19:4, 117:9-15, Exh. 14) ("Noble Roman's dep. I").

20. On Sunday, March 23, 2014, Noble Roman's Executive Chairman and Chief Financial Officer instructed employee Michael Lawless, Noble Roman's Senior Business Analyst, to devote at least 75% of his normal work hours to auditing 222 locations as quickly as possible. (Email, Exh. 15).

21. Noble Roman's conducted SPCs for more than 300 of its non-traditional franchisees in 2014, including Hattenhauer. (Exh. 14, Noble Roman's dep. I, 116:10-18).

22. Noble Roman's sought more than $1.3 million from its franchisees for the SPCs in 2014. (Chart of SPCs conducted in 2014, Exh. 16).

23. Noble Roman's total revenue for 2013 was $7,527,439, according to its public filings. (10-K for year ending 2014, Exh. 17 at 18).

24. Noble Roman's intends to conduct SPCs of its franchisees on an ongoing basis. (Exh. 14, Noble Roman's dep. I, 156:23-159:12).

**Noble Roman's Withdraws Funds from Hattenhauer for the Sales & Purchases Comparisons**

25. On April 1, 2014, Noble Roman's attempted to electronically withdraw $8,573.79 to cover what Noble Roman's claimed were unpaid royalties for the Oregon Location from January 2011 to February 2014 without notifying Hattenhauer of the transfer or the SPCs. (Doc. 147 at 12, ¶ 36).

26. On April 3, 2014, Noble Roman's informed Hattenhauer by telephone that it had audited the Oregon location and allegedly discovered that from January 2011 to February 2014 Hattenhauer had underreported its sales. (Email including SPC for Oregon location from January 2011 to February 2014, Exh. 18).

27. On April 4, 2014, Noble Roman's again attempted to electronically withdraw funds for the Oregon location, plus an unexplained additional $50, for a total of $8,623.79, without notice to Hattenhauer. (Doc. 147 at 13, ¶ 39; Exh. 1, D. Hattenhauer Decl., ¶ 12).

28. Hattenhauer and Hattenhauer's bank rejected Noble Roman's attempted transfer on April 4, 2014. (Doc. 147 at 13, ¶ 40; Exh. 1, D. Hattenhauer Decl., ¶ 13).

29. On April 11, 2014, Noble Roman's sent Hattenhauer an email that stated that Noble Roman's conducted an audit of the Washington location for January 2011 to February 2014, and found that Hattenhauer owed Noble Roman's $14,125.93 in unpaid royalties. Noble Roman's stated that it had initiated a draft from Hattenhauer's account. (Email, including SPC for Washington location for January 2011 to 2014, Exh. 19).

30. On April 11, 2014, Hattenhauer stated in an email to Noble Roman's that it would not allow any funds to be withdrawn from its account until authorized. (Email, Exh. 20; Exh. 1, D. Hattenhauer Decl., ¶ 14).

31. On April 14, 2014, Hattenhauer and Hattenhauer's bank rejected Noble Roman's attempt to obtain $14,125.93 via electronic funds transfer. (Doc. 147 at 13, ¶ 41; Exh. 1, D. Hattenhauer Decl., ¶ 15).

32. On April 16, 2014, Noble Roman's again attempted to obtain the alleged unpaid royalties from Hattenhauer based on the SPCs of the Washington Location via electronic funds transfer, with an additional unexplained $50 for a total of $14,175.93, without notifying

Hattenhauer. (Doc. 147 at 14, ¶ 44; Exh. 1, D. Hattenhauer Decl. ¶ 16).

33. Hattenhauer rejected Noble Roman's attempted transfer on April 16, 2014. (Doc. 147 at 15, ¶ 45).

34. On May 9, 2014, Mitchell Grunat, Noble Roman's Vice President of Franchising, sent Paul Mobley, Noble Roman's Executive Chairman and Chief Financial Officer, an email stating: "…I threaten to do the extended audit and tell [franchisees] that I expect it could double or more what they will owe, but nothing works better than seeing that number in black and white." (Email, Exh. 21).

35. On May 12, 2014, Hattenhauer sent Noble Roman's an email about the SPCs. Hattenhauer stated that: the SPCs were based on potential sales and not actual sales; Hattenhauer had pricing discounts that were not in the SPCs; Hattenhauer had a lot of waste; and the bank drafts were unethical. (Email, Exh. 22; Exh. 1, D. Hattenhauer, Decl. ¶ 17).

36. On June 20, 2014, Noble Roman's sent Hattenhauer a letter stating: "Since you have refused to pay the royalty from the initial audit, we have extended the audit period to encompass your Noble Roman's activity from the time each Noble Roman's location opened through May 2014." The letter also stated that Hattenhauer owed Noble Roman's $62,551.29 in unpaid royalties - $41,022.85 for the Washington location and $21,528.44 for the Oregon location. (Letter, Exh. 23; Doc. 147 at 7, ¶ 18; SPCs for Oregon and Washington for 2005 or 2006 to 2014, Exhs. 24, 25) ("Extended SPCs").

37. On June 24, 2014, Hattenhauer sent Noble Roman's an email stating that: Hattenhauer reported sales each week as required and Noble Roman's was paid accordingly; Hattenhauer's sites had considerable waste; and that Noble Roman's did not send Hattenhauer any documentation for its demand. (Email, Exh. 26).

38. In an email dated June 24, 2014, Hattenhauer again denied the validity of the "audits" and informed Noble Roman's that the "audits" were not authorized by the Franchise Agreements. Mr. Hattenhauer informed Noble Roman's that Hattenhauer did not consent to any attempted electronic funds transfer of any amount Noble Roman's erroneously claimed was owed. (Email, Exh. 26; Doc. 147 at 7, ¶ 19 and at 15, ¶ 46; Exh. 1, D. Hattenhauer Declaration, ¶ 18).

39. On July 17, 2014, Noble Roman's sent an email with the report pages of the Extended SPCs attached. (Email, Exh. 27).

40. On September 24, 2014, Noble Roman's informed Hattenhauer that it conducted another "audit" of the Hattenhauer Franchise Locations for the time period from June 2014 through August 2014, allegedly revealing that Hattenhauer owed an additional $639.26 in unpaid royalties. (Doc. 147 at 8, ¶ 20; SPCs for June to August 2014 for both locations, Exh. 28).

41. On September 23, 2014, Hattenhauer received notice that Noble Roman's had drafted $100.09 from Hattenhauer's bank account based on its improper method of "audit" without having previously notifying Hattenhauer of such transfer. (Exh. 1, D. Hattenhauer Decl., ¶ 19).

42. In an email dated September 24, 2014, Hattenhauer again denied the validity of Noble Roman's "audits," refused to pay royalties based on those audits, and informed Noble Roman's that its attempts to directly obtain the alleged underpaid royalty amounts from Hattenhauer's bank account were unauthorized and without notice. (Email, Exh. 29; Doc. 147 at 8, ¶ 21).

43. On September 29, 2014, Noble Roman's attempted to obtain $539.17 via electronic funds transfer, without notifying Hattenhauer of such transfer, but this attempted

transfer was rejected by Hattenhauer's bank. (Exh. 1, D. Hattenhauer Decl. ¶ 20).

44. Multiple franchisees stated that Noble Roman's did not have the authorization or permission to withdraw funds from their accounts for the SPCs before Noble Roman's withdrew funds from their accounts. (Communications from other franchisees, Exh. 30).

**Noble Roman's admits that the SPCs do not calculate Hattenhauer's actual gross sales**

45. Noble Roman's did not review the books and records maintained by Hattenhauer at Hattenhauer's Noble Roman's Pizzas or Tuscano's Italian Style Subs as a part of its SPC process. (Dep. of M. Grunat Vol. I, dated February 25, 2016, 81:6-82:23, Exh. 31) ("Grunat dep. I").

46. Noble Roman's relied on the distributor reports to determine franchisee purchases for the SPCs. Noble Roman's did not verify the information in the distributor reports before relying on them to charge Hattenhauer for alleged unpaid royalties. (Exh. 14, Noble Roman's dep. I, 87:9-88:12). Distributor McDonald Wholesale did not review Hattenhauer's original invoices to verify the data in the monthly distributor reports that it sent to Noble Roman's. (Exh. 9, McDonald dep. 89:5-90:2).

47. When Noble Roman's performed audits of its company-owned restaurants, its internal auditor reviewed the books and records of that particular location, including register tapes and deposits. (Dep. of M. Lawless, dated February 8, 2016, at 14:19-16:25, Exh. 32).

48. For its franchisees, Noble Roman's used a "Sales & Purchases Comparison," in which it calculated the difference between Hattenhauer's reported sales and what Noble Roman's estimated the sales should have been ("SPCs"), to perform its "audits." The estimated sales in the SPCs were potential sales, based on ingredient purchases. (Exh. 32, Lawless dep. at 83:7-84:4, 97:10-98:7.)

49. Noble Roman's admits that the SPCs calculate estimated sales, not actual sales.

(Exh. 31, Grunat dep. I, 110:1-15; Exh. 32, Lawless dep. 103:24-104:9). The SPCs compare a unit's reported sales to potential sales, not actual gross sales. (Exh. 31, Grunat dep. I, 103:11-16).

50. Noble Roman's calculated estimated sales by multiplying the cases ordered of a core ingredient required to make a menu item, times the quantity per case, times the menu price per item, adjusted by an estimated sales mix by product type. (Exh. 32, Lawless dep., at 87:24-90:14; Exh. 2 at 2).

51. Noble Roman's cannot point to a particular day, week, or month in which Hattenhauer underreported its sales. (Lawless dep., 215:11-25, Exh. 32).

52. Hattenhauer reported its actual gross sales of Noble Roman's and Tuscano's products, and timely paid royalties on those gross sales. (Exh. 1, D. Hattenhauer Decl., ¶ 22).

53. Noble Roman's admits that the SPCs do not take into account ingredients that were purchased, but were not made into Noble Roman's products because they were damaged in shipping, handling, or preparation. (Exh. 32, Lawless dep., 214:24-215:10).

54. Noble Roman's SPCs charge royalties for products that were never sold to Hattenhauer's customers, including product lost to theft and waste. (Exh. 14, Noble Roman's dep. I, 71:17-76:11).

55. The "sales mix" is a percentage of the various types of products sold, e.g. 60% of pizzas have 1-topping. (Exh. 32, Lawless dep. 139:16-140:4).

56. Noble Roman's used the same estimated sales mix in all of the SPCs. The sales mix in the SPCs for Hattenhauer's locations was not the sales mix for Hattenhauer's locations. (Exh. 32, Lawless dep., 139:8-141:21).

57. In the "Grab and Go" service style at Hattenhauer's locations, products are placed

in a warmer for purchase. The products must be discarded after particular set time periods ("holding times") outlined in Noble Roman's Standard Operating Procedures ("SOP") Manuals. When the products are discarded, they are considered waste. (Dep. of J. Bales, dated March 11, 2016, at 55:4-7, 92:7-96:2, Exh. 33) ("Bales depo").

58. Noble Roman's used waste allowances of 2%, 3%, or 5% in all of the SPCs. The waste allowances in the SPCs for Hattenhauer's locations were not Hattenhauer's actual waste. (Exh. 32, Lawless dep., 141:23-142:20).

59. In 2014, Hattenhauer sent Noble Roman's weekly reports regarding the amount of waste incurred at its franchises, but Noble Roman's disregarded that waste in the SPCs for that time period. (Exh. 1, D. Hattenhauer Decl., ¶ 23; Exh. 14, Noble Roman's dep. I, at 225:9-21).

60. Noble Roman's instructed Hattenhauer to keep the warmer stocked at all times. (Exh. 3, Noble Roman's dep. II at 75:7-76:-4; Exh. 6 at 3).

61. Hattenhauer incurred a larger amount of waste than the allowances in the SPCs because it prepared products to keep the warmer stocked, per with Noble Roman's instructions, that were not ultimately sold to its customers. (Exh. 1, D. Hattenhauer Decl., ¶ 25).

62. The SPCs did not take into account the inventory that Hattenhauer had at the beginning or ending of the time frame. (Exh. 14, Noble Roman's dep. I, at 226:2-16).

63. Several of the menu prices in the SPCs for Hattenhauer's locations are estimated, and Noble Roman's cannot identify the source of those estimated prices. (Exh. 32, Lawless dep. at 41:3-43:1, 144:16-148:15).

64. Noble Roman's used a single menu price for each core ingredient in each SPC. (Exh. 32, Lawless dep., 149:20-151:8).

65. Hattenhauer sold Noble Roman's products at lower prices than full menu price

through value meals, coupons, frequency cards, specials, and other promotions. Hattenhauer changed its menu prices over time. (Exh. 1, D. Hattenhauer Decl., ¶ 26).

66. Noble Roman's admits that the SPCs calculations would be affected if Hattenhauer sold products for a lower price than the price in the SPCs. (Exh. 32, Lawless dep. 150:17-151:9).

67. Noble Roman's disregarded discount programs, frequency cards, value meals or other promotions with special pricing in the SPCs. (Exh. 32, Lawless dep., 167:9-24; Dep. of M. Grunat, Vol. II, 13:15-15:7, Exh. 34) ("Grunat dep. II").

68. Noble Roman's SPCs ignored that the 7-inch pizza dough was used to make Noble Roman's omelets and Noble Roman's cinnamon rounds. (Exh. 32, Lawless Dep., at 102:11-18, 155:17-158:13). Hattenhauer sold the omelets and cinnamon rounds for lower prices than 7" pizzas, and sold breakfast burritos for less than the chicken wraps. (Exh. 1, D. Hattenhauer Decl., ¶ 27).

**<u>Noble Roman's discriminates against Hattenhauer for the Sales & Purchases Comparisons</u>**

69. In 2014, Noble Roman's decided to bill franchisees for royalties with a difference of more than 20% between its estimate of a franchisee's sales and a franchisee's reported sales. When a franchisee operated multiple units, Noble Roman's applied the 20% parameter to the average sales difference of the multiple units. The 20% number was an "arbitrary" number. (Exh. 14, Noble Roman's dep. I, 70:6-71:16).

70. Noble Roman's did not give Hattenhauer a credit for 20% of the sales differences in Hattenhauer's SPCs. (Exh. 1, D. Hattenhauer Decl., ¶ 28).

71. Noble Roman's did not charge one of the units operated by franchisee Village Pantry, LLC, even though its SPCs had a sales difference greater than 20%. (Letter from Noble Roman's to Village Pantry, LLC, dated April 16, 2014, and SPC for Zionsville, Indiana location,

Exh. 35).

72. In 2014, Noble Roman's conducted a SPC for franchisee "Pic N Save" and lowered the menu price for the 14" pizza dough because the franchisee stated it ran specials on 14" pizzas. (SPC for Pic N Save, Exh. 36). The SPC shows a sales difference less than 20%, but the sales difference would have been greater than 20% if Noble Roman's did not take that special into account. (T. Elliot Decl. ¶ 11).

73. Noble Roman's did not extend the time frame of the SPCs for most of the franchisees that it "audited" in 2014. (Chart of SPCs conducted in 2014, Exh. 16).

**Noble Roman's lacks meaningful quality control**

74. Noble Roman's has five employees, called franchise managers or franchise consultants, who conduct on-site inspections and training for roughly 750 locations. (Dep. of S. Mobley, dated April 21, 2016, 145:23-146:15, Exh. 37) ("S. Mobley dep.").

75. Hattenhauer requested training for the Goldendale location on April 2, 2014. (Exh. 11, T. Elliot Decl., ¶ 7). The training was never provided. (*Id.*).

76. Noble Roman's provides instructions and specifications for the preparation of its products in its Standard Operating Procedures Manuals ("SOP Manuals"). The SOP Manuals that Noble Roman's gave to Hattenhauer do not specify the pizza cheese that must be used. (Excerpts of SOP Manuals from 2005 and 2011, Exh. 38; Exh. 1, D. Hattenhauer Decl., ¶ 24).

77. Hattenhauer requested updated manuals for both Hattenhauer locations in August 2012. Hattenhauer requested manuals in October 2014. Noble Roman's provided pages from the 2013 Manual to Hattenhauer in November 2014. (Exh. 1, T. Elliot Decl., ¶¶ 6,8,9).

78. The Noble Roman's approved distributors who served Hattenhauer's locations changed several times during Hattenhauer's franchises. Each distributor used different item codes and product description for Noble Roman's products. (Exh. 1, D. Hattenhauer Decl. ¶ 29).

79. Each Noble Roman's distributor prepared monthly reports of the purchases for all of Noble Roman's franchisees that the distributor served ("distributor reports"). (Exh. 14, Noble Roman's dep. I, 87:9-88:12).

80. Noble Roman's created monthly reports regarding the number of cases of certain products that Hattenhauer and other franchisees purchased from distributor McDonald Wholesale ("product reports"). The product reports showed that Hattenhauer's Oregon location purchased 0 cases of Noble Roman's pizza cheese for several years. (Excerpts of product reports, Exh. 39; Exh. 9, McDonald dep., 64:16-74:6).

81. On September 25, 2014, Noble Roman's informed Hattenhauer in an email that the Oregon location had been buying Golden California cheese instead of Noble Roman's pizza cheese. (Email, Exh. 40).

82. On September 26, 2014, Hattenhauer stated in an email: "This was very alarming to us as we had not realized that this location was purchasing the wrong product," that the cheese was discontinued, and that the cheese was replaced with the correct product. (Email, Exh. 41).

83. Noble Roman's did not routinely review the monthly reports from its distributors to determine whether franchisees purchased the correct products. (Exh. 3, Noble Roman's dep. Vol. II, 138:13-141:25).

84. Noble Roman's did not have a uniform ordering procedure for its franchisees, and did not have an employee who was responsible for reviewing the order guides that its distributors created for Noble Roman's franchisees. (Exh. 37, S. Mobley dep., 202:9-25; Exh. 14, Noble Roman's dep. I, 126:23-128:9).

85. Noble Roman's does not compete with Hattenhauer. (Noble Roman's Interrogatories Answers, ¶ 4, Exh. 42).

86. The term "gross sales" in the industry means the net proceeds the franchisee received for the payment of goods and/or services covered by the franchise agreement. (Decl. of Steven J. Montgomery, Exh. 43).

## ARGUMENT AND AUTHORITIES

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. "A genuine issue of fact exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818-19 (7th Cir.1999) (internal citation omitted).

### I. HATTENHAUER IS ENTITLED TO SUMMARY JUDGMENT ON BOTH PARTIES' BREACH OF CONTRACT CLAIM REGARDING ROYALTIES.

"Under Indiana law, the elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 644 (7th Cir.), *reh'g denied*, 807 F.3d 839 (7th Cir. 2015). The primary question is whether either party breached the contract.[1]

Courts must enforce the plain and ordinary meaning of clear and unambiguous language in a contract. *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). Accordingly, the words in a contract are "given their usual and common meaning." *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 579-80 (Ind. 2013). The court may not disregard the

[1] The contracts undisputedly exist. Hattenhauer's damages are undisputed, as Noble Roman's withdrew funds for royalties it claims were due. (SOF 41.)

contract's actual terms, render terms ineffective and meaningless, or insert terms that are not there. *Claire's Boutiques, Inc. v. Brownsburg Station Partners, LLC*, 997 N.E.2d 1093, 1102 (Ind. Ct. App. 2013). Further, "when the meaning of the text is clear, recourse to other provisions of the contract is unnecessary, and [the court] may not forage through the contract looking for other provisions." *Id.* at 1098.

### A. Noble Roman's breached the Franchise Agreements by charging royalties for estimated and potential sales instead of actual gross sales.

The Franchise Agreements allow Noble Roman's to collect 7% of Hattenhauer's "Gross Sales" of the Noble Roman's Pizza or Tuscano's Italian Style Subs as a royalty fee. (Docs. 1-1, 1-2, 1-3, 1-4, § IV.B). Per the Franchise Agreements, "…the term 'Gross Sales' shall mean **the total selling price** of all products and services and all income of every other kind and nature related to the Noble Roman's Pizza…" (Docs. 1-1,1-2, 1-3, 1-4 § IV.C) (emphasis added).[2]

Noble Roman's acknowledged a year and a half ago that: "The purpose of Noble Roman's Complaint is to identify how much 'Gross Sales' is 'actually the case.'" (Doc. 29 at 4) (emphasis added). This Court agreed, stating "…Hattenhauer would owe additional royalty fees because its gross sales were, in fact, higher than what it originally reported." (Entry on Partial Motion to Dismiss, Doc. 52 at 4) (emphasis added). Now, after the completion of discovery, it is clear that Noble Roman's was not concerned with whether Hattenhauer's gross sales were, in fact, higher than reported. Noble Roman's wants royalties for "the amount of sales that the stores should have been able to achieve." (Noble Roman's Brief, Doc. 159 at 3). Noble Roman's has admitted that it is seeking royalties on Hattenhauer's *potential* or *estimated* sales, not Hattenhauer's actual gross sales. (SOF 48, 49.) On this admission alone, Hattenhauer is

[2] One of the Franchise Agreements was for Noble Roman's "Tuscano's Italian Style Subs" concept. The Franchise Agreement is substantially the same, except the phrase "Noble Roman's Pizza" is replaced with "Tuscano's Italian Style Subs."

entitled to summary judgment on both parties' breach of contract claims regarding payment of royalties.

Even if this Court thinks an admission is not enough, Noble Roman's cannot deny the meaning of its own contract based on the common and usual meaning of the phrase "selling price." *See Holiday*, 983 N.E.2d at 579-80 (reviewing dictionary definitions to determine usual and common meaning). Merriam-Webster defines "selling price" as "the price for which something actually sells." *Selling Price*, Merriam-Webster.com, accessed June 9, 2016 (http://www.merriam-webster.com/dictionary/selling price). Similarly, Black's Law Dictionary defines selling price as: "The total amount for which property is sold, often including the cost of any services that are a part of the sale." *Sales Price / Selling Price*, Black's Law Dictionary (8th ed. 2004). The plain and ordinary meaning of the Gross Sales definition establishes that Hattenhauer is required to pay royalties on its actual sales of Noble Roman's products to its customers based on the price for which the products actually sold.[3] Noble Roman's has not shown that Hattenhauer's actual gross sales were anything other than what it reported, nor has it even examined Hattenhauer's records to determine if the reported sales are inaccurate. (SOF 45.) Instead, it created a surrogate for an "audit" procedure – the SPCs – to charge royalties for potential or estimated sales, regardless of Hattenhauer's actual sales. (SOF 48-49).

This case is similar to what happened in the *Claire's Boutiques* case. There, the contract said a commercial tenant had the right to terminate the lease when a shopping center's

[3] Extrinsic evidence is inadmissible to interpret a clear and unambiguous contract. However, to the extent the Court finds the definition of "Gross Sales" ambiguous, the Court may admit the evidence from Steven J. Montgomery, the only disclosed expert in this matter: "In my experience as a franchisee, a member of management of a franchisor, and as a consultant, the term "gross sales" in the industry means the net proceeds the franchisee received for the payment of goods and/or services covered by the franchise agreement." (Exh. 43, ¶ 8). *See Claire's*, 997 N.E.2d at 1098, fn. 3 (extrinsic evidence admissible for ambiguous contract).

"occupancy level falls below 70% of the non-departmental retail store tenants." *Claire's,* 997 N.E. 2d at 1093. After a bench trial, the trial court accepted the landlord's argument that the term "occupancy" referred to the center's gross leasable area and not the number of tenants. *Id.* at 1097-98. The Court of Appeals reversed, finding that the contract unambiguously referred to 70% of the tenants and that the trial court should have resolved the issue on summary judgment. *Id.* at 1098-99. The landlord argued that the space was otherwise defined in square footage, but the Court said that space and square footage did not appear in the definition of occupancy in the provision at issue. *Id.* at 1100.

Like the landlord in *Claire's*, Noble Roman's seeks to rewrite the definition of a clearly defined contract term. The Franchise Agreements unambiguously state that Noble Roman's is only entitled to royalties on Hattenhauer's gross sales, defined as the total *selling* price. Noble Roman's asks the Court replace "total selling price" with "what Noble Roman's believes sales could have been." Noble Roman's own words on the face of the SPCs acknowledge that they merely compare a unit's reported sales to "potential sales." (*See, e.g.* Exh. 2). Noble Roman's admits that its SPCs only calculate a franchisee's estimated sales or potential sales, not its actual sales, and that it cannot point to a single day, week, or month in which Hattenhauer underreported its actual sales (SOF 51.)

Noble Roman's relies exclusively on its estimate of potential sales to claim that Hattenhauer underpaid its royalties. (Noble Roman's Statement of Claim, Doc. 149 at 6-9). Noble Roman's calculates these estimated sales by multiplying the cases ordered of a core ingredient required to make a menu item, times the quantity per case, times the menu price per item, adjusted by an estimated sales mix by product type. (SOF 50). However, Noble Roman's admits that several of the numbers it used to create its estimate were not based on Hattenhauer's

locations. Several of the menu prices in the SPCs for Hattenhauer's locations are estimated and Noble Roman's cannot identify the source of those estimated prices. (SOF 63.) Noble Roman's was aware that Hattenhauer used promotions, value meals, and specials to discount prices to encourage sales, but disregarded Hattenhauer's actual discounted prices in the SPCs. (SOF 7, 66-67.) Noble Roman's used waste allowance of 2%, 3%, or 5% for each core ingredient in all of the SPCs for its non-traditional franchisees. (SOF 58.)[4] Noble Roman's admits that the waste allowances were not Hattenhauer's actual waste, and disregarded the waste reports that Hattenhauer sent Noble Roman's in 2014. (SOF 58-59.) Noble Roman's admits that it used an estimated sales mix in the SPCs that was unrelated to Hattenhauer's actual sales mix. (SOF 56.) Thus, the SPCs cannot calculate the total selling price of Noble Roman's products at Hattenhauer's locations.

Noble Roman's has not even attempted to determine Hattenhauer's gross sales, but demands royalties on potential sales. The Franchise Agreements do not state that Noble Roman's has sole discretion to determine the form an audit, that Noble Roman's can use an "indirect" comparison method to determine royalties, or that Hattenhauer must pay whatever amount Noble Roman's determines, regardless of whether the amount is Hattenhauer's gross sales. In reality, Hattenhauer has properly reported and paid royalties on its actual gross sales. (SOF 52.) Noble Roman's sought and still seeks money that it is not entitled to under the Franchise Agreements. Under these circumstances, Hattenhauer is entitled to summary judgment on the breach of contract claims asserted by Noble Roman's and Hattenhauer.

---

[4] These waste allowances are not in the Franchise Agreements or Noble Roman's SOP Manuals. Neither the Franchise Agreements nor the Noble Roman's SOP Manuals dictate a set amount of waste that a franchisee may incur. (*See* Exh. 38).

**B. Noble Roman's breached the Franchise Agreements by ignoring the auditing procedure that they mandate.**

The "Books and Records" provision of the Franchise Agreements require Hattenhauer to maintain certain books and records for five years, including daily sales records, sales slips, coupons, purchase orders, journals and ledgers, *et cetera*. (Docs. 1-1, 1-2, 1-3, 1-4 § IX.A). This provision also states: "Franchisor or its designees shall have the right at **<u>all reasonable times</u>** to review, audit, examine and copy **<u>the books and records of Franchisee</u>** as Franchisor may require **<u>at the Noble Roman's Pizza</u>**." (Docs. 1-1, 1-2, 1-3, 1-4, § IX.C) (emphasis added).

*i. Noble Roman's did not audit or review Hattenhauer's books and records.*

The books and records provision gives Noble Roman's the ability "to review, audit, examine and copy **<u>the books and records of Franchisee</u>**…." (Docs. 1-1,1-2, 1-3, 1-4 § IX.C). However, Noble Roman's relied on aggregate reports of franchisee purchases from its distributors to calculate Hattenhauer's potential sales without verifying the data against invoices or purchase orders. (SOF 46.) For comparison, when Noble Roman's performed audits of its company-owned restaurants, its internal auditor would review the books and records of that particular location, including register tapes and deposits. (SOF 47.) Noble Roman's admits that it did not even attempt to review such records for Hattenhauer. (SOF 45.) Noble Roman's understands how to conduct an audit; it simply chose not to audit Hattenhauer.

The Franchise Agreements do not disclose any auditing method that uses Hattenhauer's purchases to extrapolate an estimate of what Hattenhauer's could have or should have been. Such an interpretation stretches the contract terms beyond recognition. *See Dunkin' Donuts of America, Inv. v. Minerva, Inc.*, 956 F.2d 1566, 1568-70 (11th Cir. 1992), *reh'g denied*, 966 F.2d 1463 (1992). In *Minerva*, Dunkin' Donuts claimed that its franchisee underreported sales according to a "yield and usage" auditing method that estimated a store's gross sales based on how many donuts should have been produced based on the weight of a sample of donuts. *Id.* at

1568. The trial court found that the yield and usage method was not disclosed in the franchise agreements and the Eleventh Circuit affirmed. *Id.* at 1570. Like the franchisor in *Minerva*, Noble Roman's cannot use an undisclosed auditing method to claim that Hattenhauer's sales are not what they should have been.

*ii. Noble Roman's did not perform an audit at Hattenhauer's franchise locations or offices.*

The Franchise Agreements further limit Noble Roman's ability to conduct audits by stating that Noble Roman's may audit Hattenhauer's books and records "**at the Noble Roman's Pizza**." The Franchise Agreements do not define the term "Noble Roman's Pizza," so the Court may look to how the term is otherwise used in the Franchise Agreements for its meaning. *Claire's Boutiques*, 997 N.E.2d at 1102 ("If necessary, the text of a disputed provision may be understood by reference to other provisions within the four corners of the document"). The Franchise Agreements consistently use the term "Noble Roman's Pizza" to refer to the franchise. *See, e.g.*, Docs. 1-1,1-2, 1-3, 1-4 §§ Recitals ("Franchisee desires to use the System in connection with the operation of a Noble Roman's Pizza in conjunction with and as part of its facility…at the location here specified…."); II.C ("Franchisee shall open the Noble Roman's Pizza"), II.C. ("Franchisee shall complete all exterior and interior preparations for the Noble Roman's Pizza"). Noble Roman's admits that it did not conduct a review of Hattenhauer's books and records at Hattenhauer's locations. (SOF 45.)

**C. Noble Roman's breached the Franchise Agreements when it attempted to withdraw funds from Hattenhauer's franchise accounts without notice or demand for its purported "audits."**

The Franchise Agreements limit Noble Roman's ability to withdraw funds from Hattenhauer's account, and contain no provision authorizing Noble Roman's to make withdrawals for audits, let alone the SPCs.

i. *Noble Roman's breached the Franchise Agreements when it withdrew funds from Hattenhauer's account without making a demand.*

The Franchise Agreements state that "…if an inspection should reveal that such payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount overdue or understated **upon demand** with interest…" (Docs. 1-1,1-2, 1-3, 1-4 § XI.C) (emphasis added). Payment is only due *after* Noble Roman's makes a demand for payment, but Hattenhauer learned that Noble Roman's successfully withdrew funds after the fact. (SOF 41.) Noble Roman's also did not make a demand for payment for the purported unpaid royalties before it first attempted to withdraw thousands of dollars from Hattenhauer's account. (SOF 25.)

ii. *Noble Roman's breached the Franchise Agreements when it withdrew funds beyond Hattenhauer's reported gross sales.*

The Franchise Agreements do not give Noble Roman's the right to withdraw funds from Hattenhauer's accounts after an audit, even a valid one. The agreements state that after Hattenhauer reports its gross sales, "Franchisor will then deposit or transfer the **reported amounts** due into its own account using the franchisee's preauthorized checks agreement." (Docs. 1-1,1-2, 1-3, 1-4 § IV.B(2)) (emphasis added). The Franchise Agreements do not allow Noble Roman's to withdraw funds in excess of the reported royalties from Hattenhauer's financial accounts.

**D. Noble Roman's failed to mitigate its damages for the alleged unpaid royalties.**

Hattenhauer did not breach the Franchise Agreements. However, if the Court determines otherwise, Noble Roman's failed to mitigate its damages. Under Indiana law, the common law duty to mitigate damages "requires a non-breaching party to make a reasonable effort to act in such a manner as to decrease the damages caused by the breach." *Fischer v. Heymann*, 12

N.E.3d 867, 871 (Ind. 2014), *reh'g denied* (Oct. 9, 2014) (reducing damages when seller failed to take a lower offer after breach).

Noble Roman's made no effort to reduce its damages arising out of Hattenhauer's alleged unpaid royalties. Noble Roman's conducted SPCs in 2009 for August 2008 to July 2009 that showed a difference between Noble Roman's estimated sales and Hattenhauer's reported sales, which Noble Roman's believes shows unpaid royalties. (Exh. 2.) Yet, Noble Roman's did not inform Hattenhauer of its findings. (SOF 4.) Instead, Noble Roman's waited five years and conducted SPCs in 2014 that also showed a sales difference. (SOF 26, 29) If Noble Roman's had informed Hattenhauer about the results, Hattenhauer could have improved its waste and provided Noble Roman's with accurate data about its sites. Noble Roman's was not interested in improving operations or using accurate numbers. Noble Roman's cannot recover damages for any losses that occurred after it conducted the 2009 SPCs.

## II. HATTENHAUER IS ENTITLED TO SUMMARY JUDGMENT ON NOBLE ROMAN'S BREACH OF CONTRACT CLAIM REGARDING THE SUBSTITUTE CHEESE.

Noble Roman's alleges that Hattenhauer breached the Franchise Agreements by purchasing Substitute Cheese. (Noble Roman's Statement of Claim, Doc. 149 at 4-5). Hattenhauer did not breach the Franchise Agreements by purchasing the Substitute Cheese, and Noble Roman' s cannot establish any damages because Hattenhauer paid royalties on all sales of pizza with the Substitute Cheese. Further, Noble Roman's failed to mitigate its damages, because Noble Roman's did not act after its distributor reported each purchase.

### A. Hattenhauer did not breach the Franchise Agreements because it purchased the Substitute Cheese in accordance with Noble Roman's policies.

Noble Roman's cannot establish a breach for the purchase of the Substitute Cheese because Hattenhauer purchased it in accordance with Noble Roman's policies. The Franchise Agreements state: "To insure that the highest degree of quality and service is maintained,

Franchisee shall operate Noble Roman's Pizza in strict conformity with such methods, standards and specifications of Franchisor as are set forth in the Manuals…" (Docs. 1-1,1-2,1-3,1-4 § VIII.E).

Noble Roman's never specified which pizza cheese to use in the Franchise Agreements the SOP Manuals, or any other writing so Hattenhauer did not fail to comply. (SOF 76.) The SOP Manuals do not identify the pizza cheese that must be used by brand or manufacturer. (SOF 12, Exh. 38.) Rather, the SOP Manuals say, "All items used must be Noble Roman's, Inc. approved." (SOF Exh. 38.) Hattenhauer did not request the Substitute Cheese. (SOF 11.) Hattenhauer accepted the Substitute Cheese from McDonald Wholesale, the distributor that Noble Roman's approved and assigned to Hattenhauer. Indeed, Noble Roman's *approved* the use of substitutions during the period in which McDonald Wholesale substituted the cheese. (SOF 9.) Hattenhauer did not breach the Franchise Agreements by purchasing the Substitute Cheese.

**B. Noble Roman's is not entitled to damages because Hattenhauer has paid all royalties from the sales of pizzas involving the Substitute Cheese.**

Noble Roman's cannot establish damages for Hattenhauer's use of the substituted cheese because Hattenhauer paid royalties on all its gross sales, including its sales of Noble Roman's pizzas. (SOF 52.) The only amounts that Noble Roman's could expect to receive for the sale of Noble Roman's pizzas under the Franchise Agreements are the royalty fees on gross sales, which it received. (SOF 52.) Thus, Noble Roman's has received the entire benefit of its bargain.

**C. Noble Roman's failed to mitigate its supposed damages from the use of the substituted cheese.**

Noble Roman's did not act reasonably to reduce any damages arising out of Hattenhauer's use of the Substitute Cheese. Noble Roman's received a monthly report from McDonald Wholesale that detailed the cheese that Hattenhauer purchased. (SOF 18, 79.)

Further, Noble Roman's actually *created* its own reports each month that showed that Hattenhauer did not purchase NR Cheese blend for years. (SOF 80, Exh. 39.) When Noble Roman's actually reviewed its own records in September 2014 and informed Hattenhauer that the cheese at the Oregon location was incorrect, Hattenhauer corrected the error immediately. (SOF 82.) Noble Roman's had extensive documentation of Hattenhauer's purchases, but unreasonably waited to simply tell Hattenhauer or its distributor to change cheese. Noble Roman's had documentation of the very first purchase of the substituted cheese, so Noble Roman's failed to mitigate its damages when it failed to follow up after that report. Noble Roman's failed to fulfill its common law duty to mitigate its damages, and should not receive any damages for a breach of contract arising out of Hattenhauer's purchase of the substituted cheese.

## III. NOBLE ROMAN'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW.

Noble Roman's has asserted that Hattenhauer "violated the Lanham Act by selling pizzas with a nonconforming cheese while still using Noble Roman's trademark." (Doc. 55 at 9). Noble Roman's infringement theory is that for four years, from 2010 to 2014, Hattenhauer sold pizzas at just one of its two locations under the licensed NOBLE ROMAN'S mark that were genuine and conforming in every respect – dough, sauce, herbs, toppings – except that Hattenhauer made those pizzas using a cheese selected, substituted and supplied by Noble Roman's authorized ingredients supplier, McDonald, that was not the Noble Roman's preferred cheese ("NR Cheese"). This claim fails as a matter of law.

### A. Noble Roman's Lanham Act claim fails under the doctrines of laches and acquiescence because Noble Roman's was aware of the Substitute Cheese purchase for four years, and implied its consent.

The doctrine of laches is derived from the maxim that those who sleep on their rights lose them. *Chattanoga Manufacturing, Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002). The

elements of laches are: "(1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark; (2) the plaintiff inexcusably delayed in taking action with respect to the defendant's use; and (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time." *Id.* at 792-93 (*citing Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999)); *see also Wisconsin Cheese Grp., Inc. v. V & V Supremo Foods, Inc.*, 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008).

Federal courts in Indiana apply a presumption of laches to Lanham Act claims when the plaintiff delays for more than two years. *See Boss Products, Inc. v. Port-A-Pit Bar-B-Que of Edgerton, Inc.*, No. 3:05-CV-293 RM, 2009 WL 260793, at *8 (N.D. Ind. Feb. 4, 2009) (granting summary judgment on trademark dispute after applying two-year presumption of laches). The time period for the presumption of laches in a Lanham Act claim is determined by referring to the most analogous state limitation period. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002) (applying three-year presumption of laches based on an Illinois statute of limitations period). "Indiana's most analogous state statute is the Deceptive Consumer Sales Act, IND.CODE § 24–5–0.5–1 et seq., which includes a two-year statute of limitations." *Boss Products*, 2009 WL 260793, at *8. Accordingly, laches is presumed in this case because Noble Roman's delayed for four years after McDonald first reported the purchases.[5]

The doctrine of acquiescence bars relief for infringement "if the evidence shows that the owner of the mark has, through his words or conduct, conveyed his consent to the defendant's use of the mark." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, No. 14-3261, 2016 WL 2849334, at *2-3 (7th Cir. May 16, 2016). Acquiescence requires "an a*ffirmative* word or deed that conveys the

---

[5] Even without a presumption of laches, courts have found that laches barred infringement actions when the plaintiff delayed by three or four years. *See, e.g.*, *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1550 (Fed. Cir. 1984) (three year delay); *Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509, 514-15 (D.N.J. 1990) (four year delay).

trademark owner's implied consent to the junior user's use of his marks." *Id.* at *3 (internal quotations omitted) (emphasis in original). The Seventh Circuit distilled its acquiescence analysis into the following three elements: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the senior user's delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.* (internal citations omitted).

Noble Roman's knew when its distributor sold Hattenhauer the substituted cheese during the four year time period. (SOF 18, 79, 80.) Noble Roman's even *created* reports showing that the Oregon location did not purchase any of Noble Roman's preferred pizza cheese for several years. (SOF 80.) Noble Roman's sent an employee to both of Hattenhauer's locations in August 2012, and *still* did not tell McDonald or Hattenhauer to stop the purchases of Substitute Cheese. (SOF 16.) Noble Roman's could have easily resolved the issue early on with a phone call or email. Indeed, Hattenhauer stopped the purchases immediately when Noble Roman's finally raised the issue. Instead, Noble Roman's delayed, and affirmatively implied its consent when its employee conducted training at the location with the substitute cheese without commenting on it. Noble Roman's Lanham Act claims are barred by the doctrine of laches and acquiescence.

**B. Noble Roman's Lanham Act claim fails as a matter of law because its inadequate quality control caused it to abandon or forfeit its purported trademark rights, or to be estopped from complaining about Hattenhauer's putative infringement.**

"A mark shall be deemed to be 'abandoned' … (2) When any course of conduct of the owner, ***including acts of omission*** as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used ***or otherwise to lose its significance as a mark***." 15 U.S.C. § 1127 (emphasis supplied). "If the licensor does not maintain adequate quality control, the mark may be deemed abandoned, or, equivalently, the

licensor may be estopped to complain about infringements of it." *AmCan Enter., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994) (citations omitted); s*ee also TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 886 (7th Cir. 1997); J.T. McCarthy, Trademarks and Unfair Competition (2d ed. 1984) ("*McCarthy*"), at § 18:42 (If established, "a defense of abandonment … result[s] in the loss of trademark rights against the world."). On the undisputed facts here, Noble Roman's woefully deficient monitoring of and control over compliance with product specifications demonstrates that it either has forfeited[6] its rights to the NOBLE ROMAN'S Mark or is estopped from enforcing them against Hattenhauer.

Ultimately, courts ask whether the quality "control retained by the licensor [is] sufficient under the circumstances to insure that the licensee's goods or services would meet the expectations created by the presence of the trademark." *Eva's Bridal, Ltd. v. Halanick Enters.*, 639 F.3d 788, 790 (7th Cir. 2011). "[T]he standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (citing *McCarthy*, § 18:55). In *Barcamerica*, for example, the court held that there was inadequate quality control over seasonal wine sold under the mark because, "[a]t the very least, one might have expected Barca to sample (or to have some designated wine connoisseur sample) on an annual basis…." *Id.*

Noble Roman's failures in quality control are at the root of the putative infringement here and estop Noble Roman's from enforcing its purported trademark rights against Hattenhauer. *AmCan*, 32 F.3d at 235; *Barcamerica* 289 F.3d at 596. Noble Roman's claims to have five

[6] Hattenhauer bears a "heavy burden" to the extent it contends that Noble Roman's has ***forfeited*** its trademark rights, but the burden is lighter when it contends Noble Roman's is estopped from enforcing them against Hattenhauer. *TMT*, 124 F.3d at 886.

employees inspecting roughly 750 franchise units across the country. (SOF 74.) If each employee conducted 50 site inspections per year (one per week), Noble Roman's could only inspect 250 or one-third of its total locations annually. Noble Roman's has not conducted an inspection or assessment of Hattenhauer's locations since August 2010. (SOF 6.) If strict compliance with ingredients guidelines is as critical as Noble Roman's now claims, it should not have allowed its designated suppliers to substitute products and it should have been inspecting franchisees' preparation procedures and pizzas more than every several years. Moreover, Noble Roman's, renewed the Franchise Agreement at the Oregon Location in 2011. (SOF 15.)

Noble Roman's cannot rely on other purported controls to prop up its woefully deficient inspection program. It does not have a policy of reviewing the monthly distributor reports to identify incorrect product or ingredient purchases. (SOF 83.) Noble Roman's did not monitor the item codes or product descriptions that its distributors, resulting in codes and descriptions that changed over time and by location. (SOF 78.) Nor did it designate an employee to review the product order guides that franchisees used. (SOF 84.) Noble Roman's created reports that identified when its franchisees did not purchase its preferred products, but it did not follow up on those reports with the franchisee or the distributor. (SOF 80.)

If Hattenhauer's use of Substitute Cheese (or any franchisee's use of non-NR Cheese) is as problematic as Noble Roman's now claims and rises to the level of trademark infringement, then Noble Roman's quality control protocols and its implementation of them – a program that generated no compliance inspections of the Oregon Location during the four years and failed to identify that Hattenhauer was using the "wrong" cheese – are woefully deficient and inadequate. Accordingly, Noble Roman's either forfeited its putative rights to the NOBLE ROMAN'S Mark or is estopped from enforcing them against Hattenhauer on the facts of this case.

**C. Similarly, Noble Roman's Lanham Act claim fails as a matter of law because Noble Roman's cannot show that it had a rigorous quality control regime to which it adhered and Hattenhauer did not.**

A violation of Section 43(a), 15 U.S.C. § 1125(a), as alleged by Noble Roman's, is established upon proof of: "First, that the defendant used in connection with goods or services a false designation of origin or false description or representation. Second, that the defendant caused such goods and services to enter into commerce. Third, that the plaintiff is a person 'who believes that he or she is likely to be damaged as a result thereof.'" *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990). In the context of this suit, Noble Roman's must show "(1) [Hattenhauer's] material misbranding of [Noble Roman's] products, (2) [Hattenhauer's] introduction of [Noble Roman's] products into interstate commerce, and (3) the likelihood that consumers will be confused by [Hattenhauer's] material misbranding." *Id.*

Noble Roman's has relied principally on *General Elec. Co. v. Speicher*, 877 F.2d 531 (7th Cir. 1989). The line of cases cited by the *General Elec. Co.* court and their progeny make clear that Noble Roman's must "establish that the products sold by the alleged infringer are not 'genuine.'" *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998). The trademark owner "must ultimately prove that any actions taken by [the alleged infringer] violated the quality control procedures followed by" the licensor-owner. In *Polymer Technology*, the court rejected the plaintiff, Polymer's, "quality control infringement claim," because Polymer "did not carefully police" any quality control procedures it may have had in place. *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78-79 (2d Cir. 1994).

The undisputed evidence here shows that Noble Roman's allowed its authorized distributors to substitute other products. (SOF 9.) With this protocol, Noble Roman's tacitly concedes that substituting its products is not likely to injure the goodwill developed by Noble Roman's in the trademarked goods or diminish the value of its mark.

Nor does Noble Roman's have any evidence that Hattenhauer deprived it of an opportunity to inspect pizzas made with the Substitute Cheese and declare them non-conforming and inconsistent with its quality standards or to otherwise police those standards. *See Ford Motor Co. v. Cook*, 1992 U.S. Dist. LEXIS 13294 (N.D. Ill. Aug. 28, 1992) (sustaining quality control infringement theory and holding that goods were not "genuine products," because "the grilles have not gone through the usual inspection process"). In this case, however, Noble Roman's had every opportunity to inspect the Oregon Location during the four year period; it simply chose not or failed to do so. Hattenhauer's cheese purchases (or lack of them), moreover, were reported to Noble Roman's on at least a monthly basis, giving Noble Roman's at least 48 opportunities to assess Hattenhauer's compliance during the four year period. (SOF 18, 79.) In other words, the allegedly non-conforming pizzas went through the usual inspection process.

Accordingly, the pizzas made with the Substitute Cheese either passed Noble Roman's quality control protocols, or Noble Roman's did not carefully inspect, monitor, or police for compliance with any quality control guidelines it may have had in place, such as its system for tracking ingredient purchases that showed that each month over the four-year period that Hattenhauer was not purchasing any NR Cheese at the Oregon Location. Either way, Noble Roman's cannot on the undisputed evidence prevail on its "quality control infringement theory."

**D. Even if it could establish liability under the Lanham Act, which it cannot, Noble Roman's is not entitled to any monetary award under the Act on the equities of this case.**

"The Lanham Act allows [a] district court a wide range of legal and equitable remedies for a violation of the Act." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1092 (7th Cir. 1994). Under the Act, the "plaintiff shall be entitled, . . . ***subject to the principles of equity***, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (emphasis added). "Remedies are intended to make violations of

the Act unprofitable, but not to act as a penalty." *BASF Corp.*, 41 F.3d at 1092. "As the Act makes clear, the district court has wide discretion to fashion an appropriate remedy." *Id.* Here, awarding Noble Roman's any damages would be inequitable and impermissibly act as a penalty.

Noble Roman's has no evidence of and thus cannot recover ***actual*** damages as a matter of law. "A plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's Lanham Act violation, that the violation caused actual confusion among consumers of the plaintiff's product, and, as a result, that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)." *Wine & Canvas Dev. LLC v. Weisser*, 2015 U.S. Dist. LEXIS 57348 (S.D. Ind. May 1, 2015) (quoting *Web Printing Controls*, 906 F.2d at 1205). "Thus, recoverable damages are limited to the amount of money required to compensate [Noble Roman's] for the actual confusion among consumers for which [Noble Roman's] sustained injury." *Id.* Noble Roman's has no proof of actual confusion much less proof of resulting injury in the form of lost or diverted sales. Thus, Noble Roman's has no "evidence by which it could prove the elements essential to a recovery of damages …, so to it that avenue of relief is foreclosed." *Web Printing Controls,* 906 F.2d at 1205.

Noble Roman's instead asks this Court for the equitable remedy of requiring Hattenhauer disgorge any profits Hattenhauer made on sales of pizzas made with the Substitute Cheese. There is no equitable basis for such relief. "Disgorgement initially developed as a remedy to provide a plaintiff relief in equity, to serve as a proxy for damages, or to deter the wrongdoer from continuing his violations." *BASF Corp.*, 41 F.3d at 1095-96. In *BASF*, the Seventh Circuit in 1994 relied heavily on *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992), adopting its "discussion of the purposes of the wrongful profits award," *id.* at 1096, and by doing so endorsed the notion that the three bases or theories for an award of disgorged profits "share

[the] common ground" of, "[i]n varying degrees, a finding of defendant's intentional deceptiveness [as] an important consideration in determining whether an accounting [of the infringer's profits] was an appropriate remedy," *George Basch*, 968 F.2d at 1539. "The variety of circumstances in which a court may award disgorgement by no means indicate that the district court is required to award disgorgement." *BASF* 41 F.3d at 1096. (citing *Champion Plug Co. v. Sanders*, 331 U.S. 125, 131 (1947)).

Although the Seventh Circuit did not adopt the Second Circuit's bright line rule that an intent to deceive is an absolute prerequisite for an award of the infringer's profits in every circumstance, willfulness remains a critical consideration. *See Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989).[7] *See also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 950 (7th Cir. 1992); *ISP.NET.LLC v. Qwest Communs. Int'l, Inc.*, 2004 U.S. Dist. LEXIS 20237 (S.D. Ind. Sept. 24, 2004) (presence of willful deceptiveness must be considered but is not a prerequisite when deciding whether monetary relief in the form of an accounting of infringer's profits was appropriate).

Here, however, Hattenhauer is at most an "innocent infringer" as a result of using the Substitute Cheese selected and supplied by McDonald's, Noble Roman's designated ingredients supplier. Innocent infringement cannot justify the equitable remedy of an award of ***disgorged profits*** absent circumstances not present here. Indeed, the Seventh Circuit has indicated that an award of the defendant's profits is generally not appropriate where the defendant did not mean to infringe. *Gen. Elec.*, 877 F.2d at 536 (requiring defendant to disgorge profits because evidence was "inconsistent with innocent infringement"); *Roulo*, 886 F.2d at 941 ("Given the evidence of

[7] There is a split of authority in the circuits on this issue. 5 *McCarthy* § 30.62. Under the Restatement (Third) of Unfair Competition, the plaintiff cannot secure the infringer's profits unless it shows wrongful intent to cause confusion or deception. *See* Rest. (3d) of Unfair Competition, § 36, Comments g, j, § 37.

***intentional imitation*** and the substantial similarity between the two card lines, the district judge's decision to instruct the jury that an award of profits would be appropriate was not an abuse of discretion.") (emphasis added); *Sands, Taylor & Wood*, 978 F.2d at 962-63 (award of defendant's profits not warranted because finding of defendant's "bad faith" was "marginal;" remanding for consideration of reasonable royalty). The flip side of this deceptive intent or bad faith coin is the good faith of the infringer. An "accounting for profits is not appropriate where the infringer, while in a judge's eyes having violated the statute, nonetheless acted in good faith." 5 McCarthy § 30:62 (citing *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 580 F. Supp. 634, 637 (S.D.N.Y. 1984)).[8]

An award of Hattenhauer's profits is not warranted here as a matter of law. This is not a case where a competitor intentionally adopted a confusingly similar mark and used it on competing goods to confuse consumers and divert them to itself and away from the trademark owner. This, rather, is a case where a franchisee, licensed to use a mark, mistakenly and at the behest of the licensor's authorized ingredients supplier, used just one ingredient that did not conform to the licensor's specifications at one of its two franchised locations. This is a case where Noble Roman's has no evidence of actual damage, consumer confusion, competition between the parties or willful deceptiveness on the part of Hattenhauer. Because Noble Roman's does not compete with Hattenhauer (SOF 85), there is no evidence of sales being diverted from Noble Roman's to Hattenhauer. "In cases of noncompeting parties, the compensation for loss rationale is gone and the issue is whether an award of profits can be justified on the grounds of deterrence and prevention of unjust enrichment." 5 *McCarthy* § 30.59.

---

[8] In *Sands, Taylor & Wood*, the Seventh Circuit relied on *Cuisinarts*. 978 F.2d at 962.

Noble Roman's, however, has no such evidence. First, Hattenhauer's use did not enrich Hattenhauer at all, much less unjustly so. It sold pizzas made with the Substitute Cheese and would have sold those same pizzas had it used the NR Cheese. Hattenhauer also paid royalties to Noble Roman's on sales of pizzas made with the Substitute Cheese. (SOF 52.) The Substitute Cheese was, in fact, often more expensive than the NR Cheese (SOF 13), not as Noble Roman's contends some cheap, shoddy substitute that Hattenhauer surreptitiously used as part of a nefarious scheme to deceive consumers, cut corners and increase profits. Noble Roman's, in fact, admitted that it has no evidence that the Substitute Cheese was inferior or cheaper. (SOF 14.) Noble Roman's cannot show that Hattenhauer was unjustly enriched.

Nor is there any need for deterrence here, as Hattenhauer was not a willful infringer that was attempting to deceive the consuming public. At worst, the use of the Substitute Cheese was a mistake made at just one of Hattenhauer's two locations with the full knowledge and participation of Noble Roman's authorized ingredients supplier. (SOF 9, 18, 79.) That there is no need for deterrence is further bolstered by Noble Roman's inequitable conduct. After all, Noble Roman's failed to notice this error for four years,[9] conducted training at the Hattenhauer's Oregon Location but failed to object to the use of the Substitute Cheese, and renewed its franchise relationship with Hattenhauer in the middle of the four-year period. (SOF 15.) For its part, Hattenhauer immediately stopped using the Substitute Cheese once the mistake was brought to its attention. (SOF 82.)

---

[9] The Third Circuit considers six factors when determining whether equity supports disgorging an infringer's profits, including "any unreasonable delay by the plaintiff in asserting his rights ...." *Members 1st Fed. Credit Union v. Metro Bank*, 1:09–cv–1171, 2011 WL 208743, *4 (M.D. Pa. Jan. 21, 2011) (citing *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005)). Had Noble Roman's not been asleep at the wheel, it would have noticed this mistake shortly after it first happened and Hattenhauer would have promptly corrected it then, as it did four years later immediately upon being notified, leaving little, if any, profits to disgorge.

Accordingly, on the equities here, Noble Roman's is not entitled to any monetary award for the alleged Lanham Act violation. Thus, even if the Court were to somehow hold that Hattenhauer violated the Lanham Act, it should grant partial summary judgment in Hattenhauer's favor on the issue of Lanham Act monetary relief.

### E. Even if it could establish liability under the Lanham Act, which it cannot, Noble Roman's is not entitled to recover its attorney's fees as a matter of law.

Noble Roman's also has no basis as a matter of law to recover its attorney's fees under 15 U.S.C. § 1117(a) of the Lanham Act, which allows such recovery only in "exceptional cases." *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 964 (7th Cir. 2010). Even were Noble Roman's to prevail on its Lanham Act claim, it cannot on the undisputed record show that Hattenhauer "had no defense yet persisted in the trademark infringement or false advertising for which [it] was being sued, in order to impose costs on" Noble Roman's. *Id.* *See also Coach, Inc. v. Treasure Box, Inc.*, 2014 U.S. Dist. LEXIS 28713 (N.D. Ind. Mar. 6, 2014). An award of fees is precluded as a matter of law.

## IV. HATTENHAUER IS ENTITLED TO JUDGMENT IN ITS FAVOR UNDER THE INDIANA CRIME VICTIM'S RELIEF ACT.

The Indiana Crime Victims Relief Act ("ICVRA") creates a private cause of action for victims who suffer pecuniary loss as a result of violations of certain Indiana criminal statutes. Ind. Code § 34-24-3-1; *Larson v. Karagan*, 979 N.E.2d 655, 661 (Ind. Ct. App. 2012) (affirming treble damages for loss related to criminal conversion). The claimant only needs to prove the elements of the criminal act by a preponderance of the evidence, and a conviction for the crime is not a condition precedent to recovery. *Larson*, 979 N.E.2d at 661. The ICVRA allows Hattenhauer to recover up to three times the actual damages suffered, along with other forms of monetary relief. Ind. Code § 34-24-3-1. Noble Roman's committed the crimes of deception,

criminal trespass, and criminal conversion against Hattenhauer, causing Hattenhauer's pecuniary loss. Thus, Hattenhauer is entitled to recover its losses and other damages under the ICVRA.

The crime of deception occurs when a person "knowingly or intentionally makes a false or misleading written statement with intent to obtain property, employment or an educational opportunity." Ind. Code § 35-43-5-3(a)(2).[10] Criminal trespass occurs when a person "knowingly or intentionally interferes with the possession or use of the property of another person without the person's consent." Ind. Code § 35-43-2-2(b)(4). Criminal conversion occurs when a person "knowingly or intentionally exerts unauthorized control over property of another person." (Ind. Code § 35-43-4-3). Pecuniary losses caused by deception, criminal trespass and criminal conversion are recoverable under the ICVRA. *See Heartland Resources, Inc. v. Bedel*, 903 N.E.2d 1004, 1007-08 (Ind. App. Ct. 2009) (affirming treble damages award under ICVRA for crime of deception); Ind. Code § 34-24-3-1 (allowing treble damages for pecuniary losses caused by violations of theft crimes in Ind. Code § 35-43).

Noble Roman's committed the crime of deception each time it stated that it had conducted an audit of Hattenhauer's locations, each time it stated that Hattenhauer underreported sales, and each time it stated that Hattenhauer owed Noble Roman's royalties. Noble Roman's knew that it did not conduct an audit of Hattenhauer's franchise locations, that it had no basis to assert that Hattenhauer had underreported its sales, and Hattenhauer does not owe Noble Roman's any royalty payments. The SPCs were not audits under the Franchise Agreements and Noble Roman's knew that the SPC's calculations were based on numbers that were not related to Hattenhauer. Noble Roman's made those statements in order to justify its attempts to withdraw

---

[10] Conduct is intentional when the actor has the conscious objective to engage in certain conduct. *Larson*, 979 N.E.2d at 661 (*citing* Ind. Code § 35-41-2-1). Conduct is knowing when the actor is "aware of a high probability" that it is engaging in the conduct. *Id.*

funds from Hattenhauer's financial accounts, and Noble Roman's relied on those statements when it successfully withdrew money from Hattenhauer's account. Hattenhauer is entitled to recover all of the amounts allowed under the ICVRA because of Noble Roman's knowing and intentional false statements that it made to obtain Hattenhauer's property.

Noble Roman's also committed criminal trespass and conversion. Noble Roman's admits that it withdrew funds from Hattenhauer's financial accounts after Hattenhauer explicitly stated that Noble Roman's did not have permission to do, thereby exercising unauthorized control over Hattenhauer's property and knowingly interfering with Hattenhauer's possession of the funds.

Further, Noble Roman's was aware of a high probability that it did not have the authorization or consent to withdraw funds from Hattenhauer's bank accounts, because other franchisees objected when Noble Roman's withdrew funds from their accounts. (SOF 44.) Noble Roman's relied on the false calculations in these SPCs to withdraw or attempt to withdraw over $1.3 million from its franchisees' financial accounts. (Exh. 16.) Noble Roman's pattern of unauthorized control over the property of franchisees establishes its criminal intent to commit criminal trespass and criminal conversion against Hattenhauer. *See Midland-Guardian Company v. United Consumers Club, Inc.*, 499 N.E.2d 792, 798 (Ind. Ct. 1986.)

Noble Roman's committed several crimes against Hattenhauer, causing Hattenhauer pecuniary losses and injury. Accordingly, Noble Roman's has committed the crimes of criminal trespass and criminal conversion, and Hattenhauer is entitled to summary judgment.

## IV. NOBLE ROMAN'S VIOLATED THE WASHINGTON CONSUMER PROTECTION ACT AS A MATTER OF LAW.

Hattenhauer is entitled to summary judgment on its Washington Consumer Protection Act ("CPA") claim because of Noble Roman's unfair and deceptive business practices, including unlawful discrimination and bad faith. Claims under the CPA have five elements: "(1) an unfair

or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered." *Trujillo v. Northwest Trustee Services, Inc.*, 355 P.3d 1100, 1107 (Wash. 2015). Hattenhauer can establish all the elements with the undisputed facts; therefore, Hattenhauer is entitled to summary judgment.

**A. Noble Roman's violations of the Franchise Investment Protection Act are unfair and deceptive acts or practices under the CPA.**

The FIPA governs the relationship between franchisors and franchisees. *See* Wash. Rev. Code Ann. § 19.100.180. When a franchisor commits any of the acts prohibited by Section 19.100.180, including discrimination between franchisees and bad faith conduct, the franchisor commits an unfair or deceptive act or practice under the Consumer Protection Act. Wash. Rev. Code Ann. § 19.100.180; Wash. Rev. Code Ann. § 19.100.190(1). Noble Roman's has done both, and is thus liable under the Consumer Protection Act for treble damages and attorney fees.

*i. Noble Roman's unlawfully discriminated against Hattenhauer.*

"Discriminat[ion] between franchisees in the charges offered or made for royalties…or in any other business dealing" is a violation of the FIPA and a *per se* unfair or deceptive act. Wash. Rev. Code Ann. § 19.100.180 (b)(2); Wash. Rev. Code Ann. § 19.100.190(1). Once the franchisee shows discrimination, the burden shifts to the franchisor to prove "that any classification of or discrimination between franchisees is: (i) Reasonable, (ii) based on franchises granted at materially different times and such discrimination is reasonably related to such difference in time, or is based on other proper and justifiable distinctions considering the purposes of this chapter, and (iii) is not arbitrary." *Id.* Noble Roman's discriminated against Hattenhauer for charges for royalties, and cannot prove its conduct was reasonable, based on proper and justifiable distinctions between franchisees, and not arbitrary.

First, Noble Roman's applied a parameter that it volunteers is "arbitrary" to determine which franchisees were "okay" and which franchisees should be charged for the SPCs. (SOF 69.) Noble Roman's determined that if there was a difference of more than 20% between its inaccurate estimates for potential sales and a franchisee's reported sales, then the franchisee must be underreporting. (SOF 69.) Noble Roman's also stated that when a franchisee operated multiple units, Noble Roman's applied the 20% parameter to the average sales difference of the multiple units. (SOF 69.) Noble Roman's admitted that this 20% parameter is "arbitrary." (SOF 69.) Yet, Noble Roman's relied on this arbitrary figure to withdraw funds from Hattenhauer's financial accounts, and to attempt to withdraw thousands more. Noble Roman's charged Hattenhauer royalties for products that were never sold to customers, while it did not charge franchisees with sales differences less than 20% beyond their reported sales. (SOF 69.)

Second, Noble Roman's did not consistently apply its arbitrary parameter to its franchisees. Noble Roman's withdrew funds for a Hattenhauer SPC with a 12.2% sales difference and attempted to withdraw funds for a SPC that only had a sales difference of 18.5%. (SOF 40-43, Exh. 28.) According to Noble Roman's arbitrary parameter, Hattenhauer's locations were operated properly during those time frames. Further, Noble Roman's charged both of Hattenhauer's locations, but chose not to charge one unit operated by a three-unit franchisee, Village Pantry, LLC because it was was "close enough to where it should be that we are not billing their underreporting." (SOF 71.) The uncharged unit had a sales difference of 31.6%, higher than Noble Roman's arbitrary 20% figure, and more than twice the sales difference of the SPC for which Noble Roman's withdrew funds. (SOF 71, Exh. 35.)

Third, Noble Roman's "extended" the time frame of its SPCs for Hattenhauer to the beginning of Hattenhauer's franchises, while it did not extend the SPC time frame for most

franchisees. (SOF 36; Exh. 16) Noble Roman's is charging Hattenhauer significantly more for royalties than other franchisees solely because Hattenhauer refused to pay the amounts after identifying the flaws inherent in Noble Roman's SPC process.

Fourth, Noble Roman's did not take Hattenhauer's discounts and specials into account, but used a discounted menu price in a SPC for another franchisee. (SOF 67.) When Noble Roman's conducted a SPC for franchisee "Pic N Save," it lowered the menu price for the 14" pizza dough because the franchisee stated it ran specials on 14" pizzas. (Exh. 36). The January 2011 to February 2014 SPC for Pic N Save had a sales difference of 12.3%. (*Id.*) If Noble Roman's had used the franchisees full menu price for 14" pizzas, the sales difference would have been more than 20%. (SOF 72). Noble Roman's did not bill that franchisee for that SPC because it took discount pricing into account, but refused to do the same for Hattenhauer.

*ii. Noble Roman's bad faith pervaded its dealings with Hattenhauer.*

The FIPA requires Noble Roman's to act in good faith with Hattenhauer. Wash. Rev. Code Ann. § 19.100.180 (1). However, Noble Roman's knowingly used inaccurate figures in the SPCs and withdrew funds from Hattenhauer's bank accounts, failed to give Hattenhauer a 20% credit for the SPCs, extended the SPCs years beyond the books and records maintenance provision, and failed to provide training and updated manuals in a timely manner.

First, Noble Roman's acted in bad faith when it attempted to collect on the SPCs, with full knowledge that the SPCs used inaccurate inputs to calculate a mere estimate of potential sales, when the Franchise Agreements require royalties on gross sales. *See Dunkin' Donuts of America, Inv. v. Minerva, Inc.*, 956 F.2d 1566, 1568-70 (11th Cir. 1992), *reh'g denied*, 966 F.2d 1463 (1992) (finding bad faith to use indirect auditing method not disclosed in Franchise Agreements). Noble Roman's went as far as trying to take thousands of dollars from Hattenhauer without discussing the SPC, or having any communication with Hattenhauer whatsoever, in clear

contravention of its policy to provide an invoice and its contractual duty to demand payment. Noble Roman's attempted to steal thousands from Hattenhauer without basis, and sued Hattenhauer when it did not obtain as much money as it wanted. Noble Roman's conduct is the essence of bad faith.

Second, Noble Roman's acted in bad faith when it failed to give Hattenhauer a credit for 20% of the sales differences in the SPCs, particularly for the Hattenhauer SPCs with sales differences lower than 20%. If a SPC showed a sales difference greater than 20%, Noble Roman's charged the franchisee for the entire sales difference, instead of the marginal sales difference over 20%. (SOF 69-70.) Noble Roman's also charged Hattenhauer for sales differences less than 20%. (SOF 40-43, Exh. 28). Noble Roman's charged Hattenhauer in bad faith for amounts greater than its gross sales, even when the franchisees were properly operating their units according to Noble Roman's parameters.

Third, Noble Roman's acted in bad faith when it extended the time frame of the SPCs years beyond the time period in which Hattenhauer was required to maintain its books and records under the Franchise Agreements, leaving Hattenhauer unable to properly dispute the content of the SPCs. The Franchise Agreements only require Hattenhauer to maintain its books and records for five years. (Docs. 1-1, 1-2, 1-3, 1-4, § IX.A). Noble Roman's extended the Hattenhauer SPCs to encompass eight or nine years. (SOF 36.) Noble Roman's extended the SPCs to a cover a time for which Hattenhauer would likely have no records to defend itself.

Fourth, Noble Roman's acted in bad faith when it failed to provide training or updated manuals when Hattenhauer requested them. Noble Roman's failed to hire enough employees to properly train and/or inspect its franchisees, and then charged franchisees like Hattenhauer excess royalties through the SPC process based on the allegation that the franchisees failed to

properly control their operations. No Noble Roman's representative has been to Hattenhauer's franchise locations since August 23, 2012, nearly four years ago. (SOF 16-17.) Hattenhauer specifically requested training for the Goldendale location on April 2, 2014, but Noble Roman's did not provide any training in response. (SOF 75.)

Noble Roman's also failed to provide manuals to Hattenhauer in a timely manner. Hattenhauer requested updated manuals for Hattenhauer's locations in August 2012 and again in October 2014. (SOF 77.) Eventually, Noble Roman's provided updates more than two years after the initial request. (SOF 77.) Noble Roman's failed to timely provide updated manuals regarding its procedures to Hattenhauer despite repeated requests. Now, Noble Roman's attempts to charge Hattenhauer royalties not due under the Franchise Agreements, alleging that Hattenhauer failed to properly control its operations. Noble Roman's conduct was not Hattenhauer in good faith.

**B. Noble Roman's discrimination and bad faith were conducted as a part of Noble Roman's trade and practice.**

All of the conduct at issue – the SPCs, Noble Roman's attempts to collect from the franchisees, the withdrawals from Hattenhauer's financial account, the training program (or lack thereof), and the manuals – was a part of Noble Roman's business as a franchisor, a fact that Noble Roman's cannot seriously dispute.

**C. Noble Roman's unfair and deceptive practices injure the public interest.**

The CPA states that an unfair or deceptive act or practice is "injurious to the public interest" when it "(a) [i]njured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons." Wash. Rev. Code Ann. § 19.86.093. Noble Roman's unfair and deceptive acts and practices are injurious to the public interest. Noble Roman's demanded more than $1.3 million from dozens of franchisees in 2014 alone. (SOF 22.) Noble Roman's publicly states that its SPC process will be ongoing. (SOF 24.) Noble Roman's injured

other persons beyond Hattenhauer, and has the capacity to injure even more franchisees through its intended future SPCs.

**D. Noble Roman's unfair and deceptive practices directly injured Hattenhauer.**

Noble Roman's discrimination and bad faith directly harmed Hattenhauer. But for Noble Roman's discrimination and bad faith, Noble Roman's would not have conducted the SPCs and improperly withdrawn funds from Hattenhauer's accounts without demand, notice, or consent. Under these circumstances, Hattenhauer suffered an injury sufficient to maintain its CPA claim because Noble Roman's "unlawfully retained possession of funds to which" Hattenhauer is entitled. *Sorrel v. Eagle Healthcare, Inc.*, 38 P.3d 1024, 1028-29 (Wash. Ct. App. 2002) (holding that claimant who was denied rightful possession of funds for two weeks had sufficient injury for CPA claim, even though claimant had nominal damages.) Hattenhauer is entitled to summary judgment on this claim.

## CONCLUSION

For the above reasons, Hattenhauer is entitled to summary judgment on all its claims against Noble Roman's, and all Noble Roman's claims against Hattenhauer.

Dated: June 13, 2016

Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By *\/s/ Jasmine Y. McCormick*
Dawn M. Johnson, *pro hac vice*
dmj@greensfelder.com
John E. Petite, *pro hac vice*
jep@greensfelder.com
Jasmine Y. McCormick, *pro hac vice*
jmccormick@greensfelder.com
10 S. Broadway, Suite 2000
St. Louis, MO 63102-1774
Telephone: (314) 241-9090
Facsimile: (314) 345-5187

***Attorneys for Defendant Hattenhauer Distributing Company***

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of filing to the following:

Curtis T. Jones
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000; (317) 684-5173 (Fax)
cjones@boselaw.com

*/s/ Jasmine Y. McCormick*

1601398