UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NOBLE ROMAN'S, INC., Plaintiff, | ) | |
| v. | ) | Case No.: 1:14-cv-01734-WTL-DML |
| HATTENHAUER DISTRIB. CO. Defendant. | ) | |

**HDC'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Hattenhauer Distributing Company ("HDC"), through its undersigned counsel, submits it Reply Brief in Support of Its Motion for Summary Judgment (Docs. 160, 161).

**PRELIMINARY STATEMENT**

Noble Roman's, Inc. ("NR") largely regurgitates its previous arguments rather than respond to many of HDC's arguments and it again relies heavily on the Mobley Declaration, most of which is inadmissible and should be stricken for the reasons cited in HDC's opposition brief. NR makes conclusory statements to brush aside entire claims, and ignores rather than addresses key contract language that dooms its claims but supports HDC's counterclaims. And although NR wants to avoid addressing damages at this stage because it cannot prove them, HDC has moved for summary judgment on all elements of all claims in this lawsuit. For those arguments that NR fails to address, HDC is entitled to summary judgment. HDC incorporates its Response Brief in Opposition to NR's Motion for Partial Summary. (Docs. 178-179.)

**RESPONSE TO NR'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

1. NR fails to show a genuine issue of material fact as to whether NR told HDC that it had conducted an SPC for HDC's locations in 2009 and whether HDC first learned of the 2009 SPCs

during this lawsuit. (Doc. 161, SOF 4.) NR states that "Mitchell Grunat testified that he *may have discussed the 2009 audits with someone* representing [HDC]'s franchises on the telephone." (Doc. 177 at 4, ¶ 1.) A deponent's inability to recall does not create a genuine issue of material fact unless supported by specific facts or evidence. Fed. R. Civ. P. 56(e); *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). This statement is based on speculation and also directly contradicts Grunat's deposition testimony that he did not remember anything about the 2009 audits or whether he actually discussed the audits with HDC. (Doc. 177-1 at 9:15-19; 10:6-18.) Based on a search of NR's records, and a discussion with Mr. Grunat, NR admitted that it "has no record, knowledge or information concerning what was done after the audits were performed" and no records that NR took any action for the 2009 SPCs of HDC's franchises. (*See* NR's Answers to Third Set of Interrog., Exh. 1, at 2-3; NR Rule 30(b)(6) dep., Vol. 1, Exh. 2, at 113:1-14; 115:3-10.) Thus, this Court must accept HDC's testimony that NR did not inform HDC of the 2009 SPCs before this lawsuit. *See Abbott v. Sangamon County*, 705 F.3d 706, 720 (7th Cir. 2013) (finding fact that defendant ordered plaintiff to halt was undisputed because plaintiff could not recall one way or the other).

2. The 2005 Oregon Agreement requires NR to provide "During the operation of the franchised business, such additional assistance as is reasonably necessary to assist Franchisee in meeting Franchisor's quality control standards." (Doc. 1-3 at 6, § V(7).)

3. NR did not review "[HDC's] purchase records" and the "purchase records" that NR reviewed are not part of HDC's "books and records." (Doc. 177 at 5, ¶ 11.) NR admits that the records it reviewed for the SPCs were third-party aggregate reports from a distributor. (Doc. 159 at 21; Doc. 159-1 at ¶ 16; Doc. 159-1 at ¶ 23.) NR never requested any other records from HDC because NR said they are "meaningless." (Doc. 178 at 4, ¶¶ 4, 11).

4. Communications with other franchisees are not hearsay. They are offered to show that NR had notice of potential problems with respect to its authority to withdraw funds from its franchisees. *See Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008) (rejecting hearsay objection because evidence was used only to show notice); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 576 n.11 (7th Cir. 1989) (rejecting hearsay objection because consumer complaint letters were admitted to show that defendants were on notice of potential problems with their operations). They are also admissible to establish NR's intent and pattern of unauthorized conduct over the accounts of others. *See Midland–Guardian Co. v. United Consumers Club, Inc.*, 499 N.E.2d 792, 797-799 (Ind. Ct. App. 1986) (noting evidence of other possibly criminal activities is admissible to prove intent). These franchisees gave NR notice that they considered NR's conduct unauthorized and illegal. (Doc. 162-30.)

5. The evidence cited for Statements 15 and 16 (Doc. 177 at 6) regarding NR's treatment of other franchisees does not support the statements for the reasons set forth below.

**HDC'S RESPONSE TO NR'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. HDC disputes NR's statement of facts 1, 6, 11, 12 and (Mobley Decl. ¶¶ 8, 9, 17, 22 and 23) for the reasons set forth below. HDC disputes Statement 16 that NR conducted an "audit."

2. HDC did not admit it breached the contract by purchasing the wrong cheese (Statement 18), and it did not "chose not to order" (Statement 19) NR cheese. (Doc. 178 at 26 & n.15.)

3. HDC did not "systematically underreport" its Gross Sales. (Doc. 161, SOF 52.)

4. Statements 21 and 23 are disputed for the reasons set forth below.

**ADDITIONAL STATEMENT OF FACT NOT IN DISPUTE**

1. NR has the same franchise agreement for its traditional franchises as it does for its non-traditional franchises. (NR Rule 30(b)(6) dep., Vol. II, at 168:10, Exh. 3.)

# ARGUMENT

## I. HDC IS ENTITLED TO SUMMARY JUDGMENT ON CONTRACT CLAIMS.

### A. NR breached the Agreements by charging HDC royalties on estimated or potential sales that were not based on the "total selling price" of NR products.

NR fails to respond to HDC's argument about the meaning of "Gross Sales." (Doc. 161 at 26-29.) NR merely points to the definition in the Agreements and criticizes HDC for using the dictionary for a key undefined phrase used in the contractual definition. The Agreements state that NR can only charge HDC for royalties that are based on "**the total selling price**" of NR products. (Doc. 161 at 26.) Although those words are clear and unambiguous, they are undefined. Thus, HDC provided the dictionary definition for "selling price," which is "the price at which something actually sells" (*id*. at 27), which NR never disputes.

NR admits it is charging HDC royalties based on *estimated* and *potential* sales instead of *actual* gross sales. (Doc. 161, SOF 48-49.) NR also admits that its SPC method for calculating these estimated or potential sales is based on estimated prices – not "the total selling price" or "the price at which something actually sells" – and that it disregarded HDC's actual selling prices that were discounted prices (such as promotions, value meals and specials that would lower the total selling price of the products). (Doc. 161, SOF 49-50, 63-68.) Because the lynchpin of NR's claim is HDC's alleged failure to pay royalties on all "Gross Sales," NR's admissions that it is charging HDC royalties based on something other than the "total selling price" of NR products require judgment for HDC on NR's claim and HDC's counterclaim.[1]

### B. NR breached the Agreements by ignoring the mandated auditing procedure.

NR's defense of its SPC method is that the Agreements (1) require HDC to retain as part of its books and records its purchase orders and (2) provide that NR may audit those records.

[1] HDC incorporates its arguments on this point in its Response Brief in Opposition to Noble Roman's Motion for Partial Summary Judgment ("Opposition Brief"). (Doc. 178 at 9-12.)

Under these provisions, NR argues that it could use the "purchase records" to determine whether HDC had understated its Gross Sales, and therefore, its royalty payments. (Doc. 177 at 14-15.) The fatal flaw with this argument is that it is undisputed that NR never reviewed, copied or audited HDC's purchase records. (Doc 178 at 4, ¶ 11.) NR misleads the Court when it claims otherwise. (Doc. 177 at 5, ¶ 11.) As NR admits, the documents it reviewed and relied upon for the SPCs were third-party records, not HDC purchase orders. (Doc. 159-1 at ¶ 15.) NR never requested purchase orders maintained by HDC, and HDC never sent any purchase orders to NR. (Doc. 178 at 4, ¶ 11.) In fact, NR admits that it did not review HDC's books and records because NR determined that such records were "meaningless" for auditing the reporting of sales. (Doc. 178 at 4, ¶ 4.) Based on these admissions, HDC is entitled to summary judgment.[2]

Although NR claims the third-party reports are reliable and accurate (Doc. 177 at 6, ¶ 12), the evidence that it relies on does not support such an assertion and is thus hearsay. (Doc. 159-1, ¶ 15.) Indeed, the evidence is otherwise. The third-party report that NR relied on failed to account for at least one credit to HDC. (Doc. 178 at 4-5, ¶ 12.) NR did not verify the information in the distributor reports and the distributor did not review HDC's original invoices to verify the data in the reports that NR used for the SPCs. (Doc. 161, SOF 46.)

NR tries to save its interpretation by claiming that traditional franchisees and non-traditional franchisees simply cannot be audited in the same way. This argument is demolished by the fact that NR has the same audit provision in its franchise agreements for its traditional franchises as it does for its non-traditional franchises. (Exh. 3 at 168:10.) HDC has books and records that HDC could have audited. (Docs. 179-2 at ¶¶ 7-12; 179-8 at ¶¶ 17-18.)

NR inaccurately claims that HDC contends that an audit must only be of HDC's reported Gross Sales. (Doc. 177 at 15.) HDC has always argued that the Agreements require NR to

[2] HDC incorporates its arguments on this point in its Opposition Brief. (Doc. 178 at 13-13.)

review HDC's books and records at the Franchise Location. Otherwise, the requirement that HDC preserve its "books, records, and accounts," – in NR's own words – "would serve no purpose." (Doc. 177 at 15.) The Agreements do not state that NR will audit HDC based on purchases rather than Gross Sales. Because NR is attempting to rewrite the Agreements to do so, the Court should enter summary judgment for HDC.

**C. NR did not perform an audit of HDC's records at HDC's franchise locations.**

NR again ignores words in the Agreements by failing to address HDC's arguments that NR must conduct an audit "at the Noble Roman's Pizza," which means at HDC's locations. (Doc. 31.) NR does not dispute this interpretation, and it is undisputed that NR did not conduct an audit of HDC's books and records at HDC's locations. (Doc. 161, SOF 45.) Thus, HDC is entitled to summary judgment.[3] *Altizer v. Retherford*, No. 1:14-CV-31-WTL-TAB, 2015 WL 3843668, at *5 (S.D. Ind. June 22, 2015) (granting defendants' summary judgment motion on some claims because plaintiffs failed to respond to defendants' arguments in response brief).

**D. NR breached the Agreements by taking money out of HDC's bank accounts.**

NR never responds to HDC's argument that the Agreements state that payment is only due *after* NR makes a demand for payment and that HDC only learned after the fact that NR withdrew its funds. (Doc. 161, SOF 41.) NR did not make a demand for payment for the purported unpaid royalties before it first attempted to withdraw thousands of dollars from HDC's account. (Doc. 161, SOF 25.)[4] Nor does it counter the argument that the Agreements state that after HDC reports its gross sales, "Franchisor will then deposit or transfer the **reported amounts** due into its own account using the franchisee's preauthorized checks agreement." (Doc. 1-1.)

[3] HDC incorporates its arguments on this point in its Opposition Brief. (Doc. 178 at 12-13.)

[4] NR claims its Franchise Disclosure Document ("FDD") (required to be provided to franchisees prior to buying a franchise) contained certain disclosures, but it cites no evidence. (Doc. 177 at 18.) The FDD states that the amounts due are payable "within 5 days after demand." *See* Oregon FDD, Exh. 4. NR did not give five days' notice.

(emphasis added). The Agreements do not allow NR to withdraw funds in excess of the reported amounts for royalties from HDC's financial accounts.[5] Based on NR's failure to respond to these two points, HDC is entitled to summary judgment.

**E. <u>NR breached its duty to train and assist HDC in meeting NR's quality control standards and royalty provisions.</u>**

NR's reliance on the Agreements' "sole discretion" language to claim that it had no duty to provide *any* training or inspection after the initial training period is misplaced. First, that language is not in the 2005 Oregon NR Agreement. (Doc. 1-3 at 6, § V(7).) NR has failed to dispute the facts that show NR's failure to provide assistance to HDC for that franchise. The most egregious example of NR's failure to provide assistance is in 2009, when NR conducted an SPC of HDC's locations that it said showed under-reporting of Gross Sales, yet no one told HDC. (Doc. 161, SOF 4-5.) Then, NR conducted SPCs in 2014 that it claims showed similar levels of under-reporting from the beginning of both franchises and the purchase of unauthorized cheese for periods covered by the 2005 Oregon Agreement. NR cannot claim that it was not "reasonably necessary" to inform HDC of (1) its 2009 SPC findings of alleged underreporting and (2) the monthly reports NR received showing HDC purchased the wrong cheese. (Doc. 161, SOF 79-80.) In fact, NR admits as such. (Doc. 162-40 ("once we…called attention to the underreporting [in 2014], you or your staff took steps to more fully" report sales).) NR's breach caused HDC to spend large sums of money to defend itself against claims that it failed to operate its franchises in conformity with NR standards when NR had information for years that it could have used to assist HDC in meeting the franchise standards that it now claims HDC breached.

Accepting NR's interpretation of the "sole discretion" Agreements as allowing NR to provide no training beyond initial training would be to render the provision void and

---

[5] HDC incorporates its arguments on this point in its Opposition Brief. (Doc. 178 at 14-15.)

unenforceable as an illusory promise.[6] Here, the undisputed evidence demonstrates NR's failure to comply with its obligation to provide training and reasonably assist HDC to meet NR's royalty and quality control standards. In addition, although Indiana courts do not imply a covenant of good faith and fair dealing in every contract, courts have recognized the existence of a good faith requirement in the context of a franchise agreement. *See, e.g., Carter Tire & Auto Serv. Inc. v. Goodyear Tire & Rubber Co.*, No. EV 84-238-C, 1988 WL 150703, at *3 (S.D. Ind. Nov. 14, 1988); *Montgomery Ward & Co., Inc. v. Tackett*, 323 N.E.2d 242, 245-46 (Ind. Ct. App. 1975) (finding evidence adduced to support franchisee's claim where franchisee tried to resolve problems with franchisor, which made no such efforts and noting principal owes agent obligation of exercising good faith and must use care to prevent agent from suffering harm during relationship). HDC is entitled to summary judgment on its claim that NR breached its duty to train and operationally assist HDC.

**F. <u>NR failed to respond to HDC's argument regarding failure to mitigate damages.</u>**

NR fails to respond to HDC's argument regarding its failure to mitigate damages as a result of the 2009 SPC that it failed to share with HDC, claiming without citation to authority that damages present issues of fact for a jury. (Doc. 177 at 19.) As a result, NR concedes this

---

[6] Indiana courts regularly look to Samuel Williston, *The Law of Contracts* ("*Williston*"), for guidance. *See, e.g., State v. IBM*, 51 N.E.3d 150, 160 (Ind. 2016). In *Flood v. Clearone Communs., Inc.*, 618 F.3d 1110 (10th Cir. 2010), the Tenth Circuit relied in part on *Williston* to find that a contract provision that vested one of the parties with unfettered discretion was not illusory and too indefinite for legal enforcement but rather enforceable because that discretion was bounded by the duty of good faith and fair dealing. *Id.* at 1123. Citing *Williston*, the court noted that "[o]ne of the most common types of [illusory] promises" is one "where the promisor retains an unlimited right to decide later the nature or extent of his or her performance." *Id.* at 1119-20. The court held that the provision was enforceable through "interpretation," as "courts will 'find implied promises of good faith and fair dealing to prevent a party's promise from being performable merely at the whim of the promisor' and thus illusory," since "reasonable, lawful, and effective contract interpretations are preferred to ones that render agreements of no effect." *Id.* (internal quotation marks and citations omitted). *See Conwell v. Gray Loon Outdoor Mktg. Group*, 906 N.E.2d 805, 813 (Ind. 2009) ("court will not find that a contract is so uncertain as to preclude specific enforcement where a reasonable and logical interpretation will render the contract valid"). Indiana likewise recognizes the contract doctrine of illusory promises. *Druco Rests., Inc. v. Steak N Shake Enters.*, 765 F.3d 776, 784 (7th Cir. 2014) (finding clause unenforceable because performance was "entirely optional with the promisor" and the terms of the clause were so vague and indefinite that the material terms could not be ascertained).

argument. Although claiming that it need not respond to HDC's mitigation arguments, NR, at noted above, improperly attempts to create an issue of fact by claiming that it is disputed whether NR informed HDC of the results of its 2009 SPCs. (Doc. 177 at 4, ¶ 1.)

HDC properly moved for summary judgment on mitigation of damages and has shown why it is entitled to summary judgment. *Hutton v. Sally Beauty Co.*, No. 4:02-CV-00190-SEB-WG, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22, 2004) (granting defendant's motion for summary judgment on damages because plaintiff failed to mitigate her damages). At the very least, the Court must conclude that NR cannot recover damages for any losses that occurred after it conducted the 2009 SPCs. (Doc. 161 at 33.) If summary judgment is not granted on other grounds, the amount can be determined at trial.

**G. <u>The Court Should Strike Portions of Mobley's Declaration.</u>**

As an after-the-fact, undisclosed reason for using the SPC method, NR attempts to rely on extrinsic evidence in the Mobley Declaration to defeat HDC's summary judgment motion. The Court should strike portions of the declaration (including paragraphs 8, 9, 22 and 23) for the reasons cited in HDC's opposition to NR's motion for summary judgment. (Doc. 178 at 15-19.)[7] Whether the SPC method was "the only feasible way to audit sales after the fact for accurate reporting," as NR claims, is irrelevant. The Court must interpret the meaning of the contract based on the words used. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 579-80 (Ind. 2013). NR does not claim the Agreements are ambiguous, so there is no need to consider extrinsic evidence. Even if the Court did, however, HDC has submitted testimony from a convenience store industry expert, who directly refutes Mobley's unsupported statements. (Doc. 178 at 22-23; Doc. 179-8.) The IRS Guide is inadmissible and irrelevant. (Doc. 178 at

[7] NR Statement of Undisputed Facts 1, 11, 12, 17 from the Mobley Declaration should be disregarded for the reasons set forth in HDC's response to NR's summary judgment motion. Statement 6 (Doc. 159-1, Mobley Declaration ¶ 17) should also be stricken for reasons previously noted. (Doc. 178 at footnote 16 (Page ID# 3025).)

20-22.) NR has presented no evidence that an SPC is consistent with convenience store industry practice, and HDC's expert disputes that it is. (Doc. 179-8 at 6, ¶¶ 22-23.) NR merely relied on extrinsic evidence to justify NR's breach of contract after the fact.

**H. <u>NR cannot show as it must that it fully complied with the Agreements</u>.**

For the reasons cited in HDC's motion, NR cannot substantiate its allegation in its contract claim that it "has fully complied with the Franchise Agreements." (Doc. 1, ¶ 34.) (*See* Doc. 178, 27-29.) For this reason alone, HDC is entitled to summary judgment on contract claim.

**I. <u>HDC did not breach the Agreements because it cured the alleged default associated with using the wrong cheese.</u>**

NR claims that HDC defaulted under and breached the Agreements by "selling inferior quality pizza containing pizza cheese that was not Noble Roman's proprietary pizza cheese in trade dress and packaging bearing the Noble Roman's® trademark." (Doc. 1 ¶ 35.) In its general allegations, NR claims that such conduct "damaged [NR's] reputation and goodwill….and breached the Franchise Agreements." (Id. ¶ 26.)

Section XVII of the Agreements defines when HDC is in default thereunder. (Doc. 1-3, § XVII at 21-23.) Subparagraph (3) (n) of that Section deals with the "misuse" or "unauthorized use" of the NR Marks and "impair[ment] of the goodwill" associated with the NR Marks. (*Id*. at § XVII (3) (n) at 23.) It provides, however, that "notwithstanding the above" HDC "shall be entitled to notice of such event of default and shall have five days to cure such default." (*Id*.) Here, even assuming *arguendo* that HDC defaulted under or breached the Agreements because it used the wrong cheese, HDC was entitled to notice of that breach and five days to cure it. On September 25, 2014, NR notified HDC of NR's claim that HDC was using the wrong cheese. (Doc. 161, SOF 81.) There is no dispute that immediately upon receiving that notice, HDC switched cheeses to the one NR contends is specified under the Agreements (Doc. 161, SOF 82),

and thus HDC cured that purported breach. Hence, HDC's purported sales of pizza made with the wrong cheese do not constitute a default under or breach of the Agreements.

**J. There is no breach because NR authorized the Substitute Cheese by knowingly allowing HDC to purchase it from McDonald for four years.**

NR misconstrues HDC's argument on this point. HDC's point is that the contractual litmus test for whether ingredients comply with the Agreement is whether the ingredients were approved or authorized by NR. As shown in its opening papers (Doc. 178 at 25-27), NR designated McDonald as HDC's ingredient supplier or distributor (Doc. 161, SOF 9) and instructed HDC to deal directly with that distributor with respect to ingredient issues, including substitutions for out of stock items (Doc. 178, SOF 18). Like its predecessor Cheeseman, McDonald experienced ingredient shortages and sold HDC substituted ingredients, including several different pizza cheeses, and NR approved ingredient substitutions by McDonald. (Doc. 161, SOF 8-10.) McDonald selected the Substitute Cheese; HDC did not choose to purchase it in lieu of NR's proprietary cheese. (*Id.* SOF 11.) By designating McDonald as HDC's distributor and directing HDC to deal primarily with McDonald on ingredient substitutions, NR clothed McDonald with actual or apparent authority to approve those substitutions. Accordingly, HDC's use of the Substitute Cheese was approved or authorized by NR and thus in compliance with the Agreement. *See Restat. 3d of Agency*, § 2.03 ("Apparent authority is the power held by an agent ***or other actor*** to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.") (emphasis added); *Knighten v. E. Chi. Hous. Auth.*, 45 N.E.3d 788 (Ind. 2015) (relying on Restatement of Agency).

NR does not oppose HDC's argument that NR cannot complain about HDC's purchase, sale and use of the Substitute Cheese because it acquiesced to that conduct even though it knew

from McDonald's monthly reports and its own product reports ***over a period of four years*** that Hattenhauer was purchasing the Substitute Cheese and not what Noble Roman's now refers to as its "proprietary pizza cheese." (Doc. 161, SOF 79-80, 83.)[8] Accordingly, NR either acquiesced to HDC's use of the Substitute Cheese or is estopped from now complaining about that conduct. "A party standing silent while the other party to the contract fails to perform a condition will be estopped from later asserting the condition." *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326 (7th Cir. 1987) (quoting *Barton v. Chemical Bank*, 577 F.2d 1329, 1337 (5th Cir. 1978)). HDC's use of the Substitute Cheese did not breach the Agreements.

**K. NR has no evidence of any damage caused by the alleged breach.**

This Court need not even reach the preceding liability issues because it can reject NR's contract claim on an independent liability ground. To prevail on its contract claim, NR must show that it was damaged. *Brazier v. Maple Lane Apts. I, LLC*, 45 N.E.3d 442 (Ind. Ct. App. 2015) ("The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach, ***and damages to the plaintiff as a result***.") (emphasis added). NR, however, cannot show that it sustained any damages from HDC's use of the Substitute Cheese. HDC paid NR – and NR accepted – royalties on HDC's sales of pizzas made with the Substitute Cheese. NR has not even tried to show, much less shown, that it has any evidence of actual damage resulting from this alleged breach. NR says nothing in response to HDC's arguments on this score, other than to incant its mantra that it will show "the amount of damages … at trial." (Doc. 177 at 20.) This misses the point, for it is evidence of the fact of damage – not the amount – that NR must identify to resist HDC's summary judgment motion. NR simply has not done so.

[8] NR is charged with knowledge of the information in these reports. *Olin Corp. v. P. H. Glatfelter Co.*, No. CIV 1:06CV367, 2008 WL 4596262, at *10 (W.D.N.C. Oct. 14, 2008) ("It is proper, as a matter of law, to impute knowledge of those [corporate] documents' contents to" corporate defendant which possessed them); *aff'd*, 369 F. App'x 430 (4th Cir. 2010).

In *Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 51 F. Supp. 3d 828 (S.D. Ind. 2014), this Court noted that the Seventh Circuit refers to "summary judgment [as] the 'put up or shut up' moment in litigation, [when] the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." *Id.* at 842 (quoting *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)). In *Castrillon*, this Court granted summary judgment on the plaintiff's breach of contract claim because she "ha[d] no evidence that she was damaged by the alleged breach." *Id.* In doing so, it held that plaintiff had "to respond to [defendant's] argument" that she had no evidence of damages "by pointing to evidence from which a reasonable jury could find in her favor" on that issue. *Id.* Like the plaintiff there, NR fails to point to any evidence by which a jury could find that it was damaged by the alleged breach. For this reason alone, HDC is entitled to summary judgment on NR's contract claim.[9]

## II. HDC IS ENTITLED TO SUMMARY JUDGMENT ON LANHAM ACT CLAIMS.

At the outset, HDC should be granted summary judgment on all issues except for those expressly contested by NR in its opposition brief. Indeed, when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded. *Carragher v. Ind. Toll Rd. Concession Co.*, 936 F. Supp. 2d 981 (N.D. Ind. 2013); *Thomas v. Am. Family Mut. Ins. Co.*, No. 2:07 CV 162, 2008 WL 4911192, at *5 (N.D. Ind. Nov. 13, 2008) (granting summary judgment on unopposed grounds "because a party's failure to respond to an opposing party's argument implies concession"). NR does not oppose HDC's arguments that the doctrines of laches,

[9] *See also Dart Mech. Corp. v. Johnson Controls, Inc.*, No. 13-CV-2941(JS)(AYS), 2015 WL 9050384, at *5 (E.D.N.Y. Dec. 15, 2015) ("if a plaintiff can 'demonstrate a genuine issue of fact as to the existence of actual damages resulting from the breach of contract, then summary judgment…is inappropriate even if the precise amount or extent of the damages is still somewhat uncertain'").

acquiescence and estoppel bar NR's infringement claim. (*See* Doc. 161 at 35-39.) Hence, NR concedes those arguments that its Lanham Act claim fails. NR also stands mute in response to HDC's arguments that NR lacks evidence to support its claims for actual damages, disgorgement of profits or attorney's fees. (*See id.* at 41-46.) NR thus concedes those arguments, too, and HDC is entitled to summary judgment on the remedies sought by NR on its infringement claims.

NR's only opposition is to HDC's argument that NR's quality control infringement theory is fatally defective. (*See id.* at 40-41). Here, NR regurgitates its arguments in support of its own motion for summary judgment on its Lanham Act claim and does not counter HDC's arguments. HDC adopts its arguments in its Opposition Brief (*see* Doc. 178 29-34) for its reply in further support of HDC's Motion.

NR also contends with respect to liability that the quality and cost of the Substitute Cheese is irrelevant. That may be so for liability, but NR's contention unwittingly deals a fatal blow to claim for disgorged profits. Indeed, NR ignores the allegation in its Complaint – apparently designed to justify its claim for disgorgement by claiming that HDC was unjustly enriched – that HDC "profited from its acts unfair competition by purchasing an inferior and cheaper pizza cheese instead of [NR's] proprietary blend of cheese." (Doc. 1 at 29.) Because NR has no evidence to substantiate this allegation, and the evidence refutes it (Doc. 161, SOF 13, 14), NR has no evidence that HDC unjustly profited from its alleged acts of infringement or unfair competition and thus no evidence to support its requested disgorgement remedy.

## III. HDC IS ENTITLED TO SUMMARY JUDGMENT UNDER THE INDIANA CRIME VICTIMS RELIEF ACT ("ICVRA").

HDC alleges NR violated the ICVRA based on deception, criminal trespass, and criminal conversion. (Doc. 142 at ¶¶ 72-81.)[10] The evidence shows that NR claimed that it conducted

[10] HDC incorporates its argument on this point in its Opposition Brief. (Doc. 178 at 38-40.)

"audits" and found underreporting of Gross Sales when it knew it had not reviewed HDC's books and records at its franchise location and only created an estimate of potential sales, based on a number of inaccurate assumptions, and then relied on that claim to withdraw funds and repeatedly attempt to withdraw more from HDC's bank accounts without notice or consent, refused to return the funds, and continues to seek those funds as damages. (Doc. 1, ¶ 23; Doc. 161, SOF 28, 30-33, 35, 38, 41-42, 45-68.) NR's false written statements, unauthorized control over HDC's property, and intentional interference with HDC's possession and use of its property without HDC's consent, all directly caused HDC's pecuniary loss. Thus, contrary to NR's claim, HDC has established proximate cause – the harm would not have occurred but for NR's conduct – because HDC has shown "a bridge between the lie and the loss." *See Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp.3d 866, 892 (S.D. Ind. 2014).

HDC alleges that NR committed criminal trespass under Indiana Code § 35-43-2-2(b)(4) by intentionally or knowingly interfering with the possession or use of HDC's property by withdrawing funds from HDC's accounts without notifying HDC, and despite HDC's clear statements that NR should not withdraw funds based on its improper audits. (Doc. 142 at 18, ¶¶ 76-77).[11] NR disregards that, and instead argues that it did not violate another subsection of the statute that relates to trespass on real property. NR relies on *Quimby v. Caliber Home Loans*, No. 1:14-CV-013335-JMS, 2015 WL 3751511, at *9 (S.D. Ind. Apr. 22, 2015). There, plaintiff alleged that defendant improperly placed a deadlock and stickers on his real property. *Id.* at *9. The court found that plaintiff failed to allege criminal trespass because the plaintiff continued to use and possess the property after the defendant's conduct. *Id.* NR's reliance on that portion of

[11] HDC's Amended Counterclaim contains a typographical error in paragraph 77. (Doc. 142 at ¶ 77.) There is no Ind. Code § 35-43-2-2(a)(4). HDC alleges a violation of Ind. Code. § 35-43-2-2(b)(4) and quotes the correct statutory language in paragraph 76. (Doc. 142 at ¶ 76.) HDC discussed the correct statutory section in its Brief in Support (Doc. 161 at 47), so there should be no confusion. HDC has never referenced the section NR discusses.

*Quimby* is misplaced. NR withdrew money from HDC's bank accounts, and has refused to return that money to date. (Doc. 161, SOF 41.) HDC has been unable to possess and use that money as a direct result of NR's conduct. Accordingly, HDC is entitled to relief for NR's trespass onto HDC's bank account as illustrated by *Quimby*. That court found the plaintiff had properly stated a claim for relief for deception and conversion criminal by pointing to several mortgage statements in which the bank falsely alleged that the plaintiff owed the bank late fees, despite the fact that the plaintiff had already notified the bank of its errors. *Id.* The court found these written statements caused the plaintiff loss in the form of "value of time spent attempting to resolve the dispute," among other losses. *Id.* at *7. The court also found that the plaintiff alleged the elements of conversion because the bank mishandled his account by improperly allocating mortgage payments. *Id.*

Similarly, HDC has established the elements for deception, trespass and conversion, including *mens rea*. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so" and "a person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Kroger Co. v. WC Associates, LLC*, 967 N.E.2d 29, 38-39 (Ind. Ct. App. 2012) (*citing* Ind. Code § 35-41-2(a) and Ind. Code. § 35-41-2-2(b)). For criminal conversion, a person exerts "unauthorized control" if it is done without the other person's consent. Ind. Code § 35-43-4-1(b)(1).

NR sent letters and emails claiming that HDC owed NR royalties and withdrew funds from HDC's account, even after HDC pointed out the errors in the SPCs, such as the incorrect waste allowances and menu prices. (Doc. 161, SOF 35, 37, 38, 41; Exhs. 22, 26.) NR admits that its SPCs only calculate estimated sales and that it cannot point to a day, week or month that HDC underreported its sales. (Doc. 161, SOF 61.) NR relied on these written statements to

withdraw funds from HDC's account, even after HDC had told NR that it was not authorized to do so, and caused significant loss to HDC in the value of time and money spent trying to resolve this dispute. Here, NR not only knew that HDC had told it that it disputed the "audit" results and it was not authorized to take money from its bank account, but NR did so anyway. Thus, NR cannot say that it had a reasonable belief that HDC owed the amounts demanded, particularly in light of the real property trespass cases upon which NR relies. *See Larsen v. Fort Wayne Police Dept.*, 825 F.Supp.2d 965, 978 (N.D. Ind. 2010) (defendant believed he had right to be on real property after paying admission fee); *Taylor v. State*, 836 N.E.2d 1024, 1028 (Ind. Ct. App. 2005) (whether student had reasonable belief that he had right to be on school property after classes was for trier of fact to determine); *Olsen v. State*, 663 N.E.2d 1194, 1196 (Ind. Ct. App. 1996) (defendant did not have fair and reasonable belief that he had right to be in hotel lobby open to the public because he was asked to leave several times).

Furthermore, HDC has adduced evidence beyond a simple breach of contract. As HDC outlined in its opening papers and its opposition brief, the evidence shows a scheme to generate money as quickly as possible, which included a pattern of conduct exerting control over the money of other franchisees who disputed NR's right to do so, which establishes sufficient knowing or intentional conduct for recovery under the ICVRA. *See Midland–Guardian Co.*, 499 N.E.2d at 798 (affirming ICVRA judgment). At the very least, the evidence has created an issue for the fact-finder. *Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 970 (Ind. Ct. App. 2013) (finding issues of fact precluding summary judgment under ICVRA as to whether company committed deception as part of cover-up or worked to remedy issue and as to cause of pecuniary loss); *Kroger*, 967 N.E.2d at 38-39 (noting Indiana Supreme Court in ICVRA and other cases stating that "finding criminal intent in the absence of a confession invariably requires

weighing evidence, judging witness credibility, and drawing reasonable inferences from the facts, all of which are improper in considering a motion for summary judgment.”).

## IV. HDC IS ENTITLED TO SUMMARY JUDGMENT FOR VIOLATIONS OF THE WASHINGTON STATUTES.

### A. Noble Roman’s unlawfully discriminated against HDC.

First, NR failed to address one method of discrimination, which is that NR applied an admittedly “arbitrary” 20% parameter to determine which franchisees it deemed were “okay” versus ones it would charge for underreporting. (Doc. 161 at 50.) NR did not give HDC a credit for 20% of the sales differences in HDC’s SPCs. (Doc. 161, SOF 70.) Thus, NR has failed to satisfy its statutory burden of proof. Franchisors have the burden of proving that any classification of or discrimination between franchisees is: (1) reasonable, (2) based on franchises granted at materially different times and such discrimination is reasonably related to such difference in time, or is based on other proper and justifiable distinctions considering the purposes of this chapter, and (3) is not arbitrary. *See* Wash. Rev. Code Ann. § 19.100.180(2)(c).

Second, NR concedes it treated franchisees differently in not consistently applying the admittedly arbitrary parameter. (Doc. 177 at 28 (attempting to justify its failure to immediately demand payment from another franchise by alleging that because of NR’s “mistake” another “franchisee was inadvertently not billed”).) The only support NR offered in response was an excerpt from Paul Mobley’s deposition, who admitted he did not have any knowledge regarding why this franchisee was not billed. (Doc. 177-4 at 2-3.) NR claims that a “single mistake” does not constitute discrimination.[12] The evidence shows that it was not a mistake. NR specifically recited its findings in a letter to the franchisee, noting that “Zionsville was close enough to where it should be that we are not billing their underreporting.” (Doc. 162-35 at 2.)

---

[12] HDC incorporates its motion to reopen discovery and to compel with respect to this claim (Docs. 184, 185).

Third, NR claims that it extended the time frame of the SPCs for any franchisee that did not pay royalties that NR claimed were due as a result of the SPCs. NR again fails to meet its statutory burden. HDC was not required to preserve records beyond five years (Doc. 1-1 at 16, § XI.A), so it was unreasonable and arbitrary for NR to conduct an extended SPC going back nine and 10 years for HDC's franchises.

Fourth, with respect to NR's refusal to take HDC's discounts and specials into account while taking at least one other franchisee's specials into account, NR claims that "all franchisees were given the opportunity to have their audits adjusted with documented facts." (Doc. 177 at 6.) The evidence cited does not state that. (Doc. 177-4 at 6-7). It is also contrary to the evidence: (1) the NR employee who calculated the SPCs testified that NR disregarded discount programs, frequency cards, value meals or other promotions with special pricing (Doc. 161, SOF 67); (2) NR had HDC's discounted pricing from 2009 but failed to use it in the 2014 SPCs (Doc. 162-2 at 7) ("Called for pricing 8/18/09"); (3) HDC provided specific information to NR about its discounted pricing after the 2014 SPCs (Doc. 162-22 at 2); and (4) NR never told HDC that the information HDC provided about its discounted pricing was insufficient (Doc. 162-23 at 2, 162-26 at 2). Thus, although NR claims it did not consider special pricing, it did so for at least one franchisee, and even when it had HDC's documented pricing, it refused to consider it.

Lastly, NR admits that it conducted an inspection and audit of its traditional franchises, which is evidence that non-traditional franchisees such as HDC were treated differently. Traditional and non-traditional franchisees had the same "Books and Records" provision in their contracts. (Exh. 3 at 168:10.) NR's attempt to distinguish the records available for an audit at traditional franchises versus non-traditional franchisees is unreasonable and arbitrary. Both types of franchises had the same agreements. (Exh. 3.) NR knew that HDC's cash registers

created daily records of sales of NR products, called Z tapes or register tapes. (Doc. 178 at 4, ¶¶ 5-6.) NR's response ignores the fact that justifying alleged discriminatory actions requires franchisors to prove all three statutorily required elements. Therefore, NR's conclusory justifications, without any legal or factual support, are insufficient defenses to this claim.[13] NR treated HDC differently than other franchisees and is entitled to summary judgment.

**B. <u>NR's engaged in bad faith conduct against HDC.</u>**

Although NR wants to rely on its arguments for the breach claims, the difference is that the FIPA requires NR to act in good faith with HDC in the franchise relationship. Wash. Rev. Code § 19.100.180(1). "Good faith" is not defined in the statute, but as noted above in the breach of contract discussion, the duty of good faith applies where a contract grants one party discretionary authority and NR has not even attempted to defend its bad faith actions as alleged, other than to claim the Agreements allow them to do it.

## CONCLUSION

For these reasons, and for those set forth in HDC's Motion for Summary Judgment and Brief in Support (Docs. 160-162), HDC respectfully requests that the Court grant summary judgment in HDC's favor on NR's claims and on HDC's counterclaims, and for and such other relief that the Court deems just and proper.

[13] The Court should disregard the state of Washington email for the reasons that HDC has previously noted. (Doc. 178 at 37-38.) Mobley Declaration ¶¶ 19 and 21 also should be stricken as hearsay. (Doc. 159-1 at 5. ¶ 19.)

Dated: August 24, 2016 Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By *___/s/ Dawn M. Johnson______________*
Dawn M. Johnson, *pro hac vice*
dmj@greensfelder.com
John E. Petite, *pro hac vice*
jep@greensfelder.com
Jasmine Y. McCormick, *pro hac vice*
jmccormick@greensfelder.com
10 S. Broadway, Suite 2000
St. Louis, MO 63102-1774
Telephone: (314) 241-9090
Facsimile: (314) 345-5187

***Attorneys for Defendant Hattenhauer Distributing Company***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of August, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of filing to the following:

Curtis T. Jones
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000; (317) 684-5173 (Fax)
cjones@boselaw.com

*___/s/ Dawn M. Johnson______________*

1614161